(82 App. Div. 47.)

## JOSEPH v. RAFF.

(Supreme Court, Appellate Division, First Department. April 9, 1903.)

1. BANKRUPTCY—PREFERENCE—FRAUDULENT TRANSFER—TIME OF MAKING.
   Under the direct provisions of the bankruptcy act, a trustee cannot maintain an action to set aside a preference under sections 60a, 60b, Act July 1, 1898, c. 541, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3445], or to set aside a conveyance of the bankrupt's property on the ground of fraud on creditors under section 67e, where such alleged preference or transfer was made more than four months prior to the filing of the petition.

2. SAME—TRANSFER IN FRAUD OF CREDITORS—ACTIONS TO SET ASIDE—PRICE OF TRUSTEE.
   Under Bankr. Act § 70a (4), 30 Stat. 565 [U. S. Comp. St. 1901, p. 3451], vesting the trustee with title to property of the bankrupt transferred by him in fraud of creditors, and section 70e, 30 Stat. 566 [U. S. Comp. St. 1901, p. 3452], empowering the trustee to avoid any transfer of property made by the bankrupt, which any creditor might have avoided, and recover the property or its value from any person except a bona fide holder, the trustee is entitled to bring an action to set aside any transfer made by the bankrupt, regardless of the time when made, which any creditor might have brought under the laws of the state.

3. FRAUDULENT TRANSFER—ACTUAL FRAUD—EVIDENCE OF GOOD FAITH—EXCLUSION.
   A judgment setting aside a transfer of property by a bankrupt on the ground of fraud cannot be sustained on the theory of actual fraud, when the trial court excluded, over exception, evidence of good faith of the transferee.

4. SAME—ACTUAL FRAUD—ABSENCE OF EVIDENCE—OPINION OF TRIAL COURT.
   A judgment setting aside a transfer of property by a bankrupt on the ground of fraud cannot be sustained on the theory of actual fraud, when the opinion of the trial judge shows that there was no fraudulent intent on the part of either party to the agreement, and the evidence would not justify a finding that such fraud existed.

5. CORPORATIONS—TRANSFER OF ASSETS BY DIRECTORS—INSOLVENCY—EVIDENCE—EFFECT.
   In an action by a trustee in bankruptcy to set aside a transfer by a corporation to its president, under section 64 of the New Jersey general corporation act (P. L. 1896, p. 298), providing that transfers of the assets of a corporation made by the directors while insolvent, or in contemplation of insolvency, shall be void as against creditors, evidence considered, and *held* to show that the corporation was not insolvent at the time of the transfer, within the meaning of the act.

**6. CORPORATION—INSOLVENCY—WHAT CONSTITUTES.**

Where a corporation has invested a large capital in the establishment of a business, the amount of which far exceeded its liabilities, and the returns from which could not mature until the complete establishment of the business, it is to be distinguished from a fully going concern, and the mere fact that it was unable to meet its obligations by cash payments as they became due did not constitute insolvency.

**7. SAME—POWER OF DIRECTORS—RESIGNATION OF PRESIDENT—PURCHASE OF STOCK.**

The directors of a corporation, which is not insolvent, have the power, when they deem it for the best interest of the company, to request and accept the resignation of its president, paying him for his stock, back salary, and a certain sum as liquidated damages, in consideration of his resignation.

**8. SAME—RESIGNATION OF PRESIDENT—SURRENDER OF STOCK.**

A president of a corporation has the right to demand, as a condition precedent to his resignation, that he be relieved of his stock.

**9. SAME—PURCHASE OF STOCK BY CORPORATION—RESCISSION.**

A solvent corporation may purchase the stock of its retiring president with intent to reissue the same to his successor.

**10. SAME—RESCISSION—ESTOPPEL BY SUBSEQUENT INSOLVENCY.**

When a solvent corporation purchases the stock of its president in consideration of his resignation, it and its subsequent creditors should be estopped to rescind the transaction after its insolvency, and consequent inability to place him in statu quo.

Appeal from Special Term, New York County.

Action by George E. Joseph, trustee in bankruptcy of the Mutual Mercantile Company, against Norman C. Raff. From a judgment for plaintiff, defendant appeals. Reversed.

Argued before VAN BRUNT, P. J., and HATCH, McLAUGHLIN, PATTERSON, and LAUGHLIN, JJ.

William B. Ellison, for appellant.
George E. Joseph, for respondent.

LAUGHLIN, J. This is a suit in equity by the trustee in bankruptcy of the Mutual Mercantile Agency for the rescission and cancellation of an agreement entered into between the said company and the defendant on the 12th day of March, 1901, and to require the defendant to account for moneys and property received under said agreement. The complaint alleges that the contract was illegal, ultra vires, void, and in fraud of creditors, and that the acceptance of the property by the defendant constituted a breach of trust, he being at the time the agreement was negotiated president and director of the company.

The petition in bankruptcy was not filed until the 21st day of August, 1901, more than five months after the agreement sought to be rescinded and canceled had been made and consummated. Consequently the action cannot be maintained on the theory that the transfer of the property constituted a voidable preference under section 60a and 60b of the bankruptcy law, Act July 1, 1898, c. 541, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3445], nor on the ground of fraud or insolvency, under section 67e thereof. It is sought to be

¶ 9. See Corporations, vol. 12, Cent. Dig. § 1530.

maintained under section 70e, 30 Stat. 566 [U. S. Comp. St. 1901, p. 3452], which provides that "the trustee may avoid any transfer by the bankrupt of his property which any creditor of such bankrupt might have avoided, and may recover the property so transferred, unless he was a bona fide holder for value prior to the date of the adjudication. Such property may be recovered or its value collected from whoever may have received it, except a bona fide holder for value." Section 70a, 30 Stat. 565 [U. S. Comp. St. 1901, p. 3451], provides that the trustee shall "be vested by operation of law with the title of the bankrupt, as of the date when he was adjudged a bankrupt, except in so far as it is to property which is exempt; * * * (4) property transferred by him in fraud of his creditors." The effect of these provisions of the bankruptcy law cited is to authorize an action by the trustee to set aside any transfer of property by the bankrupt, regardless of when the same was made, which any creditor of the bankrupt might have maintained under the statutes or equity jurisprudence of this state. Courts of equity will, at the instance of a judgment creditor, set aside an illegal transfer of property, or one made through fraud, either actual or constructive, and appropriate the property, if it has not passed into the hands of a bona fide holder for value, to the payment of the judgment.

The judgment in the case at bar cannot be sustained on the theory of actual fraud, for two reasons: First, evidence of good faith on the part of the appellant in entering into and consummating the contract was excluded by the trial court, and an exception taken; and, second, the opinion of the learned court clearly shows that there was no fraudulent intent on the part of either party to the agreement, and the evidence would not justify a finding that such fraud existed.

The bankrupt agency was incorporated under the laws of New Jersey. It is contended by the respondent that at the time of the transfer the corporation was insolvent or on the verge of insolvency, and that the transfer constituted a breach of trust, for which the defendant must account under the equity jurisprudence of New Jersey, and that it was also in violation of section 64 of the New Jersey general corporation act (P. L. 1896, p. 298), which provides that "whenever any corporation shall become insolvent or suspend its business for want of ordinary funds to carry on the same, neither the directors nor any officer or agent of the corporation shall sell, convey, assign or transfer any of its estate, effects, choses in action, goods, chattels, rights or credits, lands or tenements; nor shall they or either of them make any such sale, conveyance, assignment or transfer, in contemplation of insolvency, and every such sale, conveyance, assignment or transfer shall be utterly null and void as against creditors; provided, that a bona fide purchase for a valuable consideration, before the corporation shall have actually suspended its ordinary business, by any person without notice of such insolvency or of the sale being made in contemplation of insolvency, shall not be invalidated or impeached."

There can be no doubt but that, if the corporation was insolvent, the transfer should be set aside, and the defendant compelled to account, both upon the ground that as president and treasurer he was

familiar with its financial condition, and in equity he will not be permitted to obtain a preference over other creditors, and also that the transfer was void under the statute quoted. Montgomery v. Phillips, 53 N. J. Eq. 217, 31 Atl. 622; Mallory v. Kirkpatrick, 54 N. J. Eq. 50, 33 Atl. 205; Bird v. Magowan (N. J. Ch.) 43 Atl. 278; 5 Thompson on Corp'ns, § 6503; Ogden v. Murray, 39 N. Y. 202; Queen v. Weaver, 38 App. Div. 628, 56 N. Y. Supp. 998. The equitable doctrine is based upon the rule that when the corporation becomes insolvent, or when it is known or apparent to the directors that it is unable to continue business, so that suspension is imminent or inevitable, the assets become a trust fund for equal distribution among the creditors, and the directors must hold the assets for that purpose, and have no right to appropriate the same in payment of their individual claims. Third Nat. Bank v. Elliott, 42 Hun, 121; affirmed 114 N. Y. 62, 21 N. E. 416; King v. Union Iron Co., 58 Hun, 601, 11 N. Y. Supp. 602; O'Brien v. East River Bridge Co., 161 N. Y. 539, 56 N. E. 74, 48 L. R. A. 122; Bird v. Magowan, supra; Mallory v. Kirkpatrick, supra; Savage v. Miller, 56 N. J. Eq. 432, 36 Atl. 578, 39 Atl. 665.

The rule as to what constitutes insolvency appears to be substantially the same in New Jersey as here. In Skirm v. Eastern Rubber Co., 57 N. J. Eq. 179, 40 Atl. 769, the court quoted with approval the definition given by Chief Justice Shaw in Thompson v. Thompson, 4 Cush. 127, as follows: "By the term 'insolvency,' however, as used in this statute, I do not understand an absolute inability to pay one's debts at some future time upon the settlement or winding up of all a trader's concerns, and a trader may be said to be in insolvent circumstances when he is not able to pay his debts in the ordinary course, as persons carrying on trade usually do;" and also quoted with approval the definition in Brouwer v. Harbeck, 9 N. Y. 589: "A corporation, like an individual, is insolvent when it is not able to pay its debts. Insolvency means a general inability to answer, in the course of business, the liabilities existing and capable of being enforced."

The facts must now be considered in the light of this statute, and of these principles of law and equity, to determine whether the transfer was void or voidable; and, for the reasons already stated, we must proceed upon the assumption that the agreement was made in entire good faith, and in the honest belief that the corporation was solvent and would be able to continue business. The company was incorporated for the purpose of preparing and selling, by subscription, books of continuous ratings of merchants and traders in the United States and elsewhere. Those interested in the corporation solicited the defendant to take stock and become its president. One of the directors made a proposition to him, and he made a counter proposition in writing, which was accepted by the board of directors on the 30th day of August, 1900, and on the 14th day of September thereafter he was duly elected president and director of the company. He held these offices and performed their duties until the 12th day of March, 1901, when a subcommittee of the directors appointed on the 20th day of December, 1900, having con-

ducted negotiations with him, made a report to the board of directors,. and the following resolutions were adopted:

"Resolved, that this board do accept the following arrangement with Norman C. Raff, as proposed by the subcommittee appointed by this board December 20, 1900: That in consideration of Mr. Raff tendering his resignation as president and director, he is to receive from this corporation $8,500 in cash upon the surrender of 85 shares preferred and 85 shares common stock of this corporation; the stock and the checks to be deposited with the Trust Company of America until the necessary papers are drawn and signed. In lieu of his claim for salary against this corporation to date, Mr. Raff is to receive the note of this company for $3,000 at thirty days. In consideration of the cancellation of his contract for employment by this company, Mr. Raff is to receive the note of the corporation at six months for $3,150 and a like note for $700. Mr. Raff likewise to accept the note of the corporation for $1,000 at four months, and a like note for $1,000 at six months, the same being extension of the note of the corporation which he now holds for $2,000 upon surrender of said note; and it was further resolved, that the officers and directors of this corporation are hereby authorized and directed to take such steps as are necessary to carry out the provisions of the agreement and to make and deliver said notes. Upon motion, it was unanimously resolved, that the resignation of Mr. Norman C. Raff as president and director of this corporation be and hereby is accepted."

These are the conditions upon which the defendant resigned as director and president. The agreement was fully executed. He surrendered the stock held by him, and received $8,500 therefor. He surrendered a $2,000 note which he held against the company for money loaned, and received two notes, one for $1,000 and the other for $1,046, the $46 being for interest on the original note for four months and six months, respectively. He also received a note for $3,000 for 30 days for salary due and owing, and two others, for $3,150 and $700, respectively, due in six months, as liquidated damages for the termination of his employment as president on a salary. In the meantime the principal stockholders had negotiated with Maurice L. Muhleman, said to have been formerly deputy assistant treasurer of the United States, to become a stockholder, director, and president, and he had agreed that he and his friends would subscribe for capital stock to the extent of $300,000. He was elected president the day the defendant resigned, but he declined to accept the election as permanent president at that time, and was elected temporary president. He retired from the office on the 17th of May thereafter, and Mr. Magruder, second vice president, then became president, and continued to hold the office until the filing of the petition in bankruptcy. It was understood that the stock to be subscribed for Muhleman and his friends was to embrace the stock surrendered by the defendant; but no formal agreement to that effect was made, and neither Muhleman nor his friends subscribed for stock as promised by him. Through the efforts of other directors, however, stock to the extent of from $75,000 to $100,000 was issued to other subscribers at par after the resignation of the defendant, and the business was continued, and debts and obligations of the company then existing and subsequently incurred, to the extent altogether of more than $50,000, were paid. The secretary could recall but one debt existing on March 12, 1901, that was not paid before the proceedings in bankruptcy were instituted; but

probably this did not include the obligations to directors and stock-holders for loans. The company had, prior to or during defendant's administration, issued a rating book covering Cuba and Porto Rico, and also a shippers' guide, and it had a foreign service in Europe, and issued special reports independently of the continuous rating, from all of which it was receiving revenue; but the book from which it expected to receive its principal revenue was a rating book for the United States, and this was completed and issued shortly prior to the 1st day of January, 1901. A statement of the assets and liabilities of the agency on March 12, 1901, was prepared on that day. It showed cash in bank, before the payment to the defendant, $1,518.02; agency subscriptions uncollected, $125,241.86; stock sub-scriptions uncollected, $6,940; total, $133,699.88. It also showed further assets classified as "plant," consisting of furniture which cost $19,543.09; typewriting machines which cost $5,482.90; cost of agencies purchased in cash or stock, $207,750; cost of printing the rating book, $71,354.58; and expenses for promotion other than those itemized, $465,699—making an aggregate outlay in preparation for its business of $769,829.75. It shows liabilities to the extent of $165,837.56; of which $58,351.47 was for salaries due to employés and officers, $84,170.70 for notes held by directors, $8,257.50 owing to directors for loans not represented by notes, $6,701.53 to Blumen-berg Press, and $6,356.38 for "sundry liabilities." For some months prior to the resignation of the defendant the expenses of the com-pany in producing the rating book were very heavy, and, as the book had not been issued, the time had not arrived for receiving revenue therefrom. Consequently the company had not sufficient money from its earnings to pay its current obligations; but for the most part its obligations, excepting for salaries, were paid, and the remaining few parties to whom it was indebted in comparatively small amounts apparently understood the situation, as did those to whom it was indebted for salaries and loans, and were willing to accept its notes and give it reasonable opportunity. No creditor sued or threatened suit. Its obligations, as will be seen, with the exception of what it owed to its employés for salaries and to its directors for money loaned, only aggregated $13,057.91. The fact that the trustee in bankruptcy only realized on the sale of the assets at public auc-tion a year and eight months later the sum of $5,000 sheds but little light on the value of those assets while it was a going con-cern at the time the defendant resigned. It is not pretended that this was a visionary scheme, which was unlikely to prove successful, nor is there any claim of incompetent management. It is incon-ceivable that these assets for the production and purchase of which this vast amount of money was expended were not worth more than sufficient to pay the obligations of the company on the 12th of March, 1901. In these circumstances, which distinguish the case from fully established going concerns, the mere fact that the company was unable to meet the obligations by cash payments as they became due does not establish insolvency. That the directors, who were apparently experienced business men, considered it solvent is shown by the fact of their advancing large sums of money from time to

time, and the fact that one of them purchased on the 25th of May, 1901, the notes of the company held by the plaintiff, the face value of which was $8,896, paying $8,100 in cash therefor. While all of the directors realized the importance and necessity, in order to insure the greatest success, of having a greater amount of working capital until subscriptions for the rating book for the United States were paid in, which they contemplated obtaining by a further sale of stock, no one seems to have regarded the company as insolvent or on the verge of insolvency, or to have considered that there was any imminent danger or probability of insolvency. It was evidently believed that Mr. Muhleman, personally or through his friends, by the purchase of capital stock, would insure the company being in sufficient funds until its revenues would be adequate to answer all requirements. This being for the best interests of the company, it was proper for the directors to endeavor to secure the defendant's resignation; and it was lawful for him to resign, and to impose as a condition that he receive the amount owing to him by the company and a reasonable allowance for giving up his salaried position. It was also lawful for him to refuse to resign the management of the company unless his stock was taken off his hands.

It is urged that the company was not authorized to purchase his stock; but, assuming it to have been solvent, we see no legal objection to such purchase, especially as it was intended to reissue the same at once to his successor. Furthermore, the transaction having been had in entire good faith, and not in contemplation of the insolvency of the company, the company would be estopped, and we think its subsequent creditors should also be estopped, from questioning the validity of the purchase of the stock by the company from the defendant, since it is impossible to rescind the sale and restore him to the position he then occupied. Had he remained a director and president, as he might and doubtless would have done but for this agreement, he would have had the benefit of his individual judgment in the management of the affairs of the company for the protection of all stockholders, including his own interest as such. We think the agreement was not void under the statute or voidable as constituting a preference, if made and consummated in good faith.

By the judgment from which the appeal is taken the defendant is compelled to account, not only for the money which he received from the corporation, but for the money which he received on a sale of its notes which he held, although it is undisputed that these notes to the extent of $4,850 have not been paid by the corporation, and therefore it has not yet sustained damage on account of them, and doubtless its bankruptcy will relieve it from payment of more than a very small percentage of these notes. However, we are disposed to place our decision on the merits, involving the entire claims of the trustee, and are of opinion that the judgment cannot be sustained.

It follows that the judgment should be reversed, and a new trial granted, with costs to appellant to abide the event. All concur.