## WESTERN & SOUTHERN FIRE INS. CO. v. MURPHEY.

No. 5786. Opinion Filed March 28, 1916.

(156 Pac. 885.)

1. **BILLS AND NOTES—Pleading—Sufficiency Against Demurrer.** In a suit on promissory notes by the payee therein, where delivery and ownership of the notes are not specifically, but are inferentially. alleged, and where the answer admits the execution and delivery of such notes to the plaintiff, the action of the court in overruling the demurrer to the petition **held** not reversible error.

2. **SAME—Demurrer to Reply.** Where the answer alleges that the contract sued on was **ultra vires,** and the reply, among other things, contained a general denial, the court properly overruled a demurrer to such reply.

3. **CORPORATIONS—Defense—Ultra Vires—Burden of Proof.** Where defense is made to promissory notes executed by a corporation on the ground that the corporation exceeded its powers in executing the same, the burden of proof is upon the party alleging such want of power to show that the acts are **ultra vires.**

4.  **CORPORATIONS—Corporate Stock—Purchase From "Surplus
    Profits."** Section 1286, Comp. Laws 1909, is to the effect that a
    corporation may purchase shares of its own stock from "surplus
    profits." the term "surplus profits" implying the difference over
    and above the capital stock, debts, and liabilities; and, where
    such shares are so purchased, it is immaterial whether the sur-
    plus was created by the stockholders or from earnings.

5.  **SAME—Purchase of Stock—Action on Purchase-Money Notes—
    Ultra Vires—Estoppel.** Where a corporation purchased stock·
    from its president and released him from certain stock subscrip-
    tions in consideration· of his resignation, in an action on its
    promissory notes given in payment therefor it is estopped to
    defend on the ground that the contract was **ultra vires,** after
    having received and retained the benefits of the transaction, and
    voluntarily placed itself in a position where it could not put the
    plaintiff **in statu quo.**

(Syllabus by Rittenhouse, C.)

*Error from Superior Court, Muskogee County;
Farrar L. McCain, Judge.*

Action by George A. Murphey against the Western
& Southern Fire Insurance Company, a corporation (now
the Amazon Fire Insurance Company, by change of name).
Judgment for plaintiff, and defendant brings error. Af-
firmed.

*D. K. Cunningham, E. C. Stanard, J. H. Wahl,* and
*C. H. Ennis,* for plaintiff in error.

*W. W. Noffsinger* and *Y. P. Broome,* for defendant
in error.

Opinion by RITTENHOUSE, C. This action was
brought by George A. Murphey against the Western &
Southern Fire Insurance Company (now Amazon Fire
Insurance Company, by change of name) upon two prom-
issory notes. The defendant company was organized in
1909 under the laws of the State of Oklahoma, with an
authorized capital stock of $1,000,000, divided into 100,-
000 shares of the par value of $10 each. In that year the

plaintiff contracted and agreed to purchase 1,000 shares of said stock, and executed and delivered his promissory notes therefor. Subsequently he was elected a member of the board of directors, and occupied such office until July 19, 1911. During that time he had paid $5,000 and interest upon said notes, and received 500 shares of the stock for which he had subscribed. He was then elected vice president of the company, and subsequently elected president, and by reason of being president he was also chairman of the board of directors and the executive committee, attending regularly the meetings of the board of directors and the executive committee, and voting at the meetings of the stockholders the 500 shares of stock. The company, while not insolvent, needed more capital, and about the middle of July, 1911, a proposition to purchase and pay $150,000 for 14,325 shares of stock of this company at about 46 cents premium was made to the company by R. C. Ayres and George A. Carden, of Dallas, Tex. A committee was thereupon appointed to investigate the proposition, and on the 19th day of July, 1911, at a meeting of the board of directors, presided over by the plaintiff, the committee reported to accept the Ayres proposition. Plaintiff opposed the proposition, unless the company would cancel his unpaid subscription for stock and cancel and surrender his note for $5,000 given therefor, and purchase and take back the 500 shares issued to him, paying him $10,000 therefor, which was to be evidenced by the giving of four promissory notes for $2,500 each, drawing interest at 8 per cent. per annum, and due in three, six, nine, and twelve months after date, and in case this was done the same to be evidenced by resolution adopted by the board of directors, in which case he would then resign as president, and allow R. C. Ayres to be

elected in his place.    The resolution was unanimously adopted, and it is as follows:

"Whereas, R. C. Ayres, as trustee for a number of persons, has submitted to this company a proposition to purchase 14,325 shares of the capital stock of the company for the sum of one hundred and fifty thousand dollars ($150,000.00) ; and

"Whereas, one of the conditions of said subscription, or proposition to purchase, is that the said Ayres shall be elected president of the said company; and

"Whereas, this committee is of the opinion that the said Ayres is a suited and proper person to fill said position; and

"Whereas, in order to put the company in position to accept such proposition, it is necessary to secure the resignation of Col. Geo. A. Murphey as its president, and Col. Murphey is only willing to resign and relinquish the position as president and director, and the salary thereunto appertaining upon the company consenting to a rescission of the contract made by him for the purchase of one thousand (1,000) shares of stock in said company and the return to him of his note of five thousand dollars ($5,000,-00) and ten thousand dollars ($10,00.00) in cash heretofore paid by him for said stock; and

"Whereas, the advantage of the company from acquiring the additional stock provided for in said proposition to said Ayres are so great it is almost imperative that said proposition be accepted; and

"Whereas, some differences have arisen between the said company and the said George A. Murphey as to his legal liability on said note, and to the end that said matter of difference between them may be adjusted and the proposition of the said Ayres be accepted, it is to the interest of the company and advantageous to its future that said contract of purchase of the said Geo. A. Murphey for

the purchase of his stock be rescinded, and the said money paid by him be returned to him without interest, and his note be returned to him in the sum of five thousand dollars ($5,000.00), and the said parties having reached a settlement and adjustment upon that basis:

"Therefore, be it resolved that the officers of this company be, and they are hereby, directed and instructed to rescind said stock contract with the said Murphey and return the sum of ten thousand dollars ($10,000.00) heretofore paid by him and cancel the five hundred (500) shares of stock heretofore issued to him and now standing in his name, and surrender to him for cancellation his note of five thousand dollars ($5,000.00) and cancel his subscription for the five hundred (500) shares of stock that said note is last payment on, now held by the company, and in payment of said ten thousand dollars ($10,000.00) to the said Murphey to execute the company's four (4) bills receivable in the sum of twenty-five hundred dollars ($2,500.00) each, payable respectively in three, six, nine, and twelve months from date, drawing interest at eight per cent. (8%) per annum, and payable to the said Geo. A. Murphey, or order."

In pursuance of this resolution the four certain promissory notes were executed for $2,500 each, the first two of which were paid upon presentation. When the third note became due, the company refused to pay, and suit was brought. Before the trial the fourth, and last, note became due, and another suit was brought against the company therefor. These two cases were consolidated and tried together, and the issues in each are the same, and they will be considered as one action hereafter.

To this action on the promissory notes an answer was filed, which admitted the execution and delivery of the notes, but alleged that the acts of the board of directors

were beyond the scope of its authority, without considera-
tion, and void, which answer is as follows:

"Comes now the defendant, and for answer to the
petition filed herein by the plaintiff alleges and states:

"First. The defendant admits that its vice president
and secretary executed and delivered to the plaintiff the
note sued on in this action, but the defendant denies that
it is liable or indebted to the plaintiff in any amount what-
ever by reason thereof as appears more fully herein.

"Second. The defendant alleges that on or about the
30th day of October, 1909, the plaintiff, George A. Mur-
phey, subscribed for 1,000 shares of the capital stock of
the defendant company, and as a part of the purchase
price therefor gave the defendant his notes aggregating
the sum of $10,000, with interest at the rate of 5 per cent.
per annum from date until paid; that thereafter, to wit,
on or about the 29th day of June, 1910, the said plaintiff,
George A. Murphey, paid to the defendant the sum of
$5,000 on the said notes, leaving a balance of $5,000, to-
gether with $333.32 interest thereon, then due and pay-
able from the plaintiff to the defendant; that thereupon
the defendant issued to the plaintiff its certificates Nos.
87 and 88 for an aggregate of 500 shares of the capital
stock of the defendant; that the plaintiff, George A. Mur-
phey, was on or about the 30th day of October, 1909, duly
elected and qualified as a director of the defendant com-
pany, and thereupon assumed to and did act as a director
of defendant company continuously until the 24th day of
August, 1911; that on or about the 31st day of December,
1910, the said plaintiff, George A. Murphey, was elected
president of the defendant company, and thereupon ac-
cepted such office and continued to act and perform the
duties of the president of the defendant company from
said time until the 24th day of August, 1911; that during
all the time the said George A. Murphey was president of
said company he was the chairman of the executive com-
mittee thereof; that during all of said times the said plain-

tiff, George A. Murphey, had and was charged with full knowledge of all the facts, circurstances, and contracts relating in every way to the defendant company and the promotion thereof and with his subscription to and purchase of stock therein; that at no time during all the same times did the plaintiff, George A. Murphey, offer, attempt to, or rescind his said subscription and purchase of stock, but, on the contrary, if there was ever a controversy existing in the mind of this plaintiff, or in fact concerning his subscription and purchase of stock, the plaintiff had by his acts with full knowledge waived the same, and fully ratified and confirmed his subscription and purchase; that he was thereafter and at the times hereinafter mentioned estopped from claiming or asserting them or from basing any assumed, alleged, or pretended contract thereon.

"Third. That, to wit, on July 19, 1911, at an adjourned meeting of the board of directors of the defendant company, at which meeting George A. Murphey, W. S. Thompson, C. H. Eckford, R. C. Ayres, George A. Carden, Milton Park, and John H. Gaston, directors, were present, and at which meeting the said George A. Murphey presided as president, a resolution was presented and passed, a copy of which resolution is hereto attached and marked Exhibit A and made a part hereof; that said resolution purports to have been introduced by W. S. Thompson, but the defendant alleges the fact to be that the said resolution was written, submitted, and its adoption urged by the plaintiff, George A. Murphey, who presided over the said meeting at the time the vote was taken and voted affirmatively thereon; that the note sued on in this action by the plaintiff was issued to him solely by reason of said transaction, but the defendant alleges the facts to be that the plaintiff, George A. Murphey, at said time arbitrarily and by reason of his position as president of the defendant company notified the directors that he would not permit the sale of stock to R. C. Ayres, trustee, to be consummated unless the defendant company would buy from him his said 500 shares of stock and cancel his subscription

for the remaining 500 shares of stock; that no controversy over said subscription and purchase of stock then or ever existed as assumed and mentioned in said resolution.

"The defendant further alleges that the said R. C. Ayres, trustee, did not demand that he be made president of the defendant company; that it was not necessary to secure the resignation of George A. Murphey as its president in order to consummate said sale of stock, as stated in said resolution, but said resolution was adopted because of the arbitrary position taken by the plaintiff as aforesaid.

"The defendant further alleges that neither at said time nor at any other time whatever had the defendant company had any surplus profits whatever with which to traffic in its own stock, and that this fact was at all times known to the said George A. Murphey.

"The defendant further alleges that the said George A. Murphey knew at said time that the defendant company was not authorized by law or by its stockholders and subscribers to its capital stock to purchase from him the said 500 shares of stock or to cancel his said subscription for said 500 shares of stock, and had full knowledge at said times of all the matters and things in this answer and cross-petition alleged and denied, but the said George A. Murphey wrote, submitted, and urged the adoption of the said resolution for the purpose on his part of concealing the truth about said transaction and for the declared purpose of making a record which was calculated to show on its face a legal and valid transaction; that at the said time the defendant company had a great many subscribers to its capital stock, to wit, about 450, who stood in the same position as the plaintiff, George A. Murphey, with reference to his subscription for 500 shares of stock, and that said subscribers have never at any time consented to or authorized the cancellation of said subscription; that neither the stockholders of the defendant company or its subscribers to stock nor any of them have consented to or

authorized the said transaction; that, in fact, an attempt was made by reason of the arbitrary and threatened position of said George A. Murphey to purchase his 500 shares of stock and to cancel his subscription for 500 additional shares of stock.

"The defendant further alleges that at the time of the execution and delivery of the note sued on as a part of the said transaction which is hereinbefore described the said officers, to wit, W. S. Thompson, vice president, and C. H. Eckford, secretary, delivered to the plaintiff, George A. Murphey, another note in the sum of $2,500, which will be due and payable on the 19th day of July, 1912; that on the 2d day of March, 1912, the defendant paid to the plaintiff, George A. Murphey, the sum of $5,000 principal and $195.55 interest pursuant to the aforesaid transaction; that in said transaction the plaintiff, George A. Murphey, surrendered to the defendant the aforesaid certificates for 500 shares of stock, and the defendant company delivered to the plaintiff his note for $5,000, which represented the balance due from the plaintiff to the defendant on said subscription, all pursuant to an attempt to purchase said stock and cancel said subscription.

"Premises considered, the defendant alleges that said entire transaction was without consideration, *ultra vires*, and void, and the defendant here tenders to George A. Murphey everything of value received by it from him pursuant to said *ultra vires* and void transaction, and particularly tenders to the said George A. Murphey certificates for 1,000 shares of its capital stock, and offers to do equity in any form, under the orders of this court that the plaintiff may be placed *in statu quo.*

"The defendant further states that said transactions should be canceled by order of this court, and judgment rendered against the plaintiff for the cancellation of the note sued on, together with the cancellation of the aforesaid note, which will become due and payable on the 19th day of July, 1912, in the sum of $2,500; a further judg-

ment should be rendered against the plaintiff, George A. Murphey, and in favor of the defendant for the sum of $5,195.55 paid by the defendant to the plaintiff under said transaction, with interest thereon at 6 per cent. from the 2d day of March, 1912, until paid; and a further judgment should be rendered against the plaintiff, George A. Murphey, and in favor of the defendant for the said sum of $10,333.32, together with interest thereon at the rate of 5 per cent. per annum from the 29th day of June, 1910, in payment for said 1,000 shares of stock; that a lien be decreed on said stock, and the same ordered sold to satisfy said debt—for all of which the defendant prays judgment against the plaintiff, together with such other, further, and different relief as may be just and equitable in the premises."

To this answer a reply was filed, denying generally the allegations of the answer, admitting the adoption of the resolution, and alleging that the defendant is estopped from denying any contract entered into with the said George A. Murphey by virtue of such resolution, or otherwise, for the following reasons, to wit:

"That said resolution truly recited all facts therein stated, and circumstances and conditions; that under and by virtue of said resolution said defendant did enter into a contract with said George A. Murphey to rescind and cancel his contract for the purchase of 10,000 shares of said company, and to return to him the amount that he had paid thereon, for the reasons set forth in said resolution, and to execute bills receivable therefor; that said contract has been in good faith and for a *bona fide* purpose executed by both said George A. Murphey and said defendant company; that said G. A. Murphey surrendered all of his stock in said company for cancellation, resigned as president of said company on the ——— day of ———, and all things on his part, and turned all his property of every nature whatsoever over to said defendant, prior to the time of the institution of this suit; that said defend-

ant company, after entering into said contract, as aforesaid, has executed and performed its part of said contract by receiving said stock from said Murphey and canceling his subscription therefor, and executing its four bills receivable in the sum of $2,500 each, as provided for in said resolution, and has paid two of said bills.

"This plaintiff, further replying, says that this defendant, and the stockholders thereof, have from time to time ratified said contract and assented to the same by consenting to and ratifying the sale of said stock and subscription of stock of George A. Murphey to said Ayres, and by the acceptance of the resignation of George A. Murphey as president, and the election of said Ayres, as provided for in said resolution, as president, and in divers and sundry other ways.

"The plaintiff, further replying, alleges that said defendant has fully received the benefits of said contract, wholly executed on the part of said George A. Murphey, and has resold the stock and subscription of stock of said George A. Murphey at its par value since receiving and canceling the same, and has received the money therefor, and still retains it; that since the entering into of said contract, as aforesaid, and the full execution of same on the part of said George A. Murphey, said corporation has reduced its capital stock, and also the par value of its shares from $10 per share to $5 per share, also changed the name of said company and reorganized the same, and the shares of stock originally contracted for by said George A. Murphey are no longer in existence; that the stockholders assented to said change of name, said reduction of the par value of the stock, and the reorganization of said company, and assented to and ratified the contract entered into by said George A. Murphey by using his stock for said purpose and his resignation of said presidency; that by reason of all the acts of said defendant said contract with said George A. Murphey has been fully ratified and confirmed, and said defendant is estopped from denying the same.

The cause was tried to the court without a jury, and the court made special findings of fact and conclusions of law as follows:

"(1)    That on the 19th day of July, 1911, the defendant, the Western & Southern Fire Insurance Company, executed to the plaintiff, George A. Murphey, two certain promissory notes of $2,500 each, as alleged in plaintiff's petitions; that at the time of the bringing of the suits said notes were due and unpaid.

"(2)    The court finds that the said notes were executed pursuant to the resolution of July 19, 1911, which resolution set forth the consideration for said notes, except that the court specifically finds that there were no differences between George A. Murphey and the company as to his legal liability on his note, which had been executed for his subscription to stock in said company, but the court finds that all of the statements in said resolution, with the exception as to differences between George A. Murphey and said company, are true, said resolution being in the words and figures as follows, to wit:    [A copy of said resolution being set out by the court in his finding, the resolution having been heretofore set out in full herein.]

"(3)    The court finds that the said George A. Murphey, in carrying out on his part the terms of the resolution of July 19, 1911, did on the 19th day of July, 1911, file and tender in writing his resignation as president and director of said company, which said resignation was afterwards by said company accepted on the 2_th day of August, 1911, also surrendered his stock to said company for cancellation, and surrendered to said company all things of any value he had of said defendant company, and retired from and severed his connection with said defendant company; that he has not, since the 19th day of July, 1911, actively participated in the affairs of said company, further than when away from home to formally sign papers to assist the change to the new management.

"(4) The court finds that said defendant company, in carrying out on its part the terms of said resolution of July 19, 1911, received the stock of said George A. Murphey, canceled the same, and reissued the same to R. C. Ayres as a part of the purchase of 14,325 shares for $150,-000, and received in payment therefor from said Ayres $10,460, which said money has been mingled with the funds and assets of said corporation, and is so now, and further executed to said George A. Murphey its four bills receivable for $10,000, payable in three, six, nine, and twelve months after date, two of which bills receivable have been paid, and the other two bills receivable are the two promissory notes sued on in this action; also that in further carrying out the terms of said resolution 14,325 shares, of which 1,000 shares were the shares of said Murphey, were transferred to R. C. Ayres, as trustee, in consideration of $150,000, which was received by said company; that said R. C. Ayres, as provided for in said agreement, was permitted to designate six of the directors of said company, and he himself elected president on the 22d day of November, 1911.

"(5) The court further finds that at the time of the purchase of the Murphey stock and the execution of the notes therefor said company had about $30,000 surplus. As to the creation of said surplus, the court finds that the questions to and answers of the witness Eckford show the facts, said questions and answers being as follows, to wit: 'Q. You stated that the company had about $30,000 at the time of the Murphey transaction? A. I did. Q. I will ask you to state how it was created? A. By the stockholders.' And in questions by Mr. Noffsinger: 'Q. Now, Mr. Eckford, how much money was due the company from interest in July; you had mortgages and loans and things of that kind, didn't you? A. Yes, sir. Q. How much was due the company from interest? A. In July, 1911? Q. Yes. A. Well. I would say . there was approximately $6,000; at any time of the year there was about $6,000 accrued interest unpaid. Q. How much in premiums did

you have on hand?   A. I could not tell you about that, Mr. Noffsinger, with any degree of accuracy.   Q. You don't know very well?   A. No, sir; of course, I could give you the figures in the rough.   Q. Well, I don't care, if you don't know, that is all I want to know.'   And the court further finds that a part of the plan and scheme of the purchase of the Murphey stock and the sale of the same to R. C. Ayres, as trustee, was to place the control of said company in said R. C. Ayres and those he represented, and that after the transfer was made to said R. C. Ayers to reduce the par value of the stock of said company from $10 to $5 per share, which was done on the 24th day of August, 1911, and said reduction of $5 per share was to be placed in the surplus fund of said company for the purpose of transacting business as they might desire to put the same to legally, and that said reduction was done by the actual stockholders on the 24th day of August, 1911.

"(6)   The court further finds that said resolution for the purchase of said Murphey stock was fully and fairly entered into, and there was no deception or fraud used in the making or execution of said resolution, and said contract was entered into for the benefit of said company.

"(7)   The court further finds that said Murphey was elected director of said corporation on the 6th day of December, 1909, and' acted as director of said company up until his resignation on the 19th day of July, 1911, also elected president of said company, and acted as such up and until the 19th day of July, 1911, and actively participated as an officer of said company during the said time, and that said Murphey was present at the meeting wherein the resolution was passed authorizing the purchase of his stock, that said Murphy drafted said resolution and assented to the same in the form and manner it. was entered into, as shown heretofore in my findings of fact in the record, and that he voted for the adoption of said resolution.

"(8) That the stockholders met on August 24, 1911, and ratified the sale of stock to R. C. Ayres, and reduced the par value of the stock of said company from $10 to $5 and created a surplus of said company of $140,000.

## "CONCLUSIONS OF LAW.

"(7) The defendant, the Western & Southern Fire Insurance Company, under the circumstances and facts as found by the court in this case, was authorized to purchase the shares of stock in the Western & Southern Fire Insurance Company of George A. Murphey at the price paid therefor.

"(2) The notes here in controversy were presumed to have been authoritatively and legally executed, and the burden is on the defendant to show the contrary.

"(3) The contract having been fully executed on the part of George A. Murphey, and partly on the part of the defendant, the Western & Southern Fire Insurance Company, and the defendant having received and retained the benefits as a result of said contract, also having reissued and resold the stock of George A. Murphey, and having received and retained the purchase price thereof, under the circumstances, evidence, and the facts found therefrom by the court, the defendant is estopped from setting up the defense of *ultra vires*.

"(4) While George A. Murphey was a director of the corporation, and regarded in equity, along with the other directors, as a trustee, the contract between him and the corporation should be closely scrutinized and set aside on slight evidence that it is fraudulent or detrimental to the interests of the corporation, but that the contract in this case is not void on its face.

"(5) That the surplus of the company could be used for carrying out the terms of the resolution shown by the evidence in this case, for the reason that the court holds that it is entirely immaterial as to how the surplus was created; that if there was a surplus in the treasury of

the company that the directors were authorized to use said surplus in carrying out the terms of the resolution."

Subsequently judgment was rendered in pursuance of the findings of fact and conclusions of law in favor of the plaintiff. There are several technical questions necessary to be disposed of in advance of the main issues.

It is first urged that the demurrer should have been sustained to the petition, because the same does not allege that the notes were delivered to the plaintiff; and under the same assignment of error it is argued that the petition fails to allege that the plaintiff is the owner and holder of the notes. The plaintiff is payee in these notes. The petition recites the execution of the notes, that the amount thereof is due to the plaintiff, and a default in the payment thereof. From these facts ownership is presumed in the plaintiff, and an allegation that they were delivered or that he is still the owner and holder is not necessary. Independent of this, the answer admits that the notes were executed and delivered to the plaintiff.

It is next urged that the demurrer to the reply should have been sustained. We have heretofore copied the gist of the answer and the reply, which clearly shows that there was an issue joined. The answer alleges that the contract was without consideration, *ultra vires,* and void. The first paragraph of the reply was a general denial, together with other allegations. The court properly overruled the demurrer. Independent of the general allegations of the reply, there was a general denial which put in issue the question of whether the contract was without consideration, *ultra vires,* and void.

The plaintiff introduced his notes in evidence, together with the resolution of the board of directors authorizing

the execution and delivery thereof; whereupon he rested his case. A demurrer was filed upon the ground that there was a variance between the pleadings and the proof. The variance complained of is that one of the notes bore an indorsement to the American National Bank, and the other was indorsed in blank, and that there was no evidence that the same had been reindorsed. The record does not disclose an indorsement on either note, either the copies attached to the petition or the notes offered in evidence, and therefore it is not necessary for us to pass upon the question of a variance.

Under this same assignment of error it is argued that, inasmuch as the answer shows the plaintiff occupied a confidential relation to the company and its stockholders, the burden of proof was on the plaintiff to prove that the transaction was fair, open, and legal; this being an exception to the rule that the burden of proof is upon the party alleging the fraud. In this we cannot agree. The answer does not allege a fraudulent transaction. The trial court found that the facts as alleged and proved were insufficient to constitute or establish fraud, and in this respect we are of the opinion that the trial court was correct. The Supreme Court of the state of New York, in the case of *Joseph v. Raff*, 82 App. Div. 47, 81 N. Y. Supp. 546, held:

"The directors of a corporation which is not insolvent have the power, when they deem it for the best interest of the company, to request and accept the resignation of its president, paying him for his stock, back salary, and a certain sum as liquidated damages, in consideration of his resignation.

"A president of a corporation has the right to demand as a condition precedent to his resignation that he be relieved of his stock.

"A solvent corporation may purchase the stock of its retiring president with intent to reissue the same to his successor."

The answer alleges an *ultra vires* act on the part of the board of directors of the corporation, and not upon the plaintiff alone, and the presumption is that the corporation acted within its powers in entering into the contract; and, where a defense is made that the corporation exceeded its powers in entering into such contract, the burden is upon the party alleging the want of power of the corporation to enter into such contract to show affirmatively that such acts were beyond the powers of such corporation. *Oxford Iron Co. v. Spradley*, 46 Ala. 98; *Mitchell v. Rome R. Co.*, 17 Ga. 574; *Safford v. Wyckoff*, 4 Hill (N. Y.) 442.

In *Richards v. Wiener Co.*, 207 N. Y. 59, 100 N. E. 592, the Court of Appeals, in speaking of an agreement by the corporation to purchase its own stock, said:

"The law will not presume, unless forced to do so, that a person intends to do an illegal act. It will not, therefore, presume that the parties intended to make an illegal contract. The contract itself therefore was perfectly legal subject to certain limitations upon its enforceability. If when the time came defendant had a sufficient surplus, the contract would be enforced. If it had not, the contract could not be enforced. In defending against plaintiff's attempt to enforce it, the burden rested upon defendant to show that it would be illegal to do so; for there is no presumption one way or the other as to the existence of a surplus. The defendant assumed this burden, but failed in sustaining it. * * *"

In *Chautauqua County Bank v. Risley*, 19 N. Y. 369, 75 Am. Dec. 347, the court held:

"The dealings of a corporation which on their face or according to their apparent import are within its charter are not to be regarded as illegal or unauthorized, without some evidence tending to show that they are of such a character. In the absence of proof there is no legal presumption that the law has been violated. On the contrary, these artificial bodies, like natural persons, are entitled to the benefit of the rule which imputes innocence rather than wrong to the conduct of men."

In *Express Co. v. Railroad Co.*, 99 U. S. 199, 25 L. Ed. 319, it is said:

"The contract of a corporation is presumed to be *infra vires,* until the contrary is made to appear."

In *Ohio & Miss. Ry. Co. v. McCarthy,* 96 U. S. 258, 24 L. Ed. 693, it is said:

"When a contract is not on its face necessarily beyond the scope of the power of the corporation by which it was made, it will, in the absence of proof to the contrary, be presumed to be valid. Corporations are presumed to contract within their powers."

The trial court made a great number of findings of fact and conclusions of law, which the defendant insists were erroneous, and requests that we consider each finding and conclusion separately, as if the same were separately stated and argued. In this we cannot comply, but will only deal with those alleged errors complained of which the defendant has argued and briefed.

The fifth finding of fact was to the effect that the company had a surplus of $30,000 at the time of the Murphey transaction. The conclusion of law was that the surplus of the company could be used to carry out the terms of the resolution; it being immaterial as to how the surplus was created. The evidence is sufficient to show

that there was a surplus. The witness Eckford testified that at the time of the Murphey transaction the surplus amounted to $30,000, but that it was created by the stockholders. It is now contended that, as there was no surplus profits as contemplated by section 1286, Comp. Laws 1909, the contract to buy the stock by the corporation was without consideration, *ultra vires*, and void, because the corporation had no power to purchase its own stock except from surplus profits. Section 1286, *supra*, is to the effect that a corporation may purchase shares of its own stock from its surplus profits. Cook on Corporations (7th Ed.) sec. 289, says:

"Upon an authorized reduction of the capital stock of an incorporated company regularly effected the amount of corporate assets over and above the amount of the capital stock as reduced and the debts is equivalent to surplus profits, and may be treated as such by the corporation. It may be set aside as surplus, or it may be divided among the stockholders proportionately, provided the rights of previous corporate creditors are not injured. * * · * Under certain circumstances the surplus may be used to buy outstanding shares of stock."

And in the case of *Strong v. Brooklyn et al.*, 93 N. Y. 426, it is said:

"The surplus, if any, which a corporation reducing the amount of its capital, under the act of 1878, is at liberty to pay to its stockholders, must in every case be ascertained and depends upon the result of an examination into its affairs, and not upon the difference between the original amount of capital and the reduced amount, and whenever, by sales of property, or by means of earnings, or otherwise, the corporation comes in possession of funds which are in excess of the reduced amount fixed as capital, it can distribute that excess without violating any law."

In the case of *Allen v. Francisco et al.*, 193 Fed. 825, 114 C. C. A. 453, the Circuit Court of Appeals for the Third Circuit held:

"A corporation, in the absence of constitutional or statutory prohibition, has in general an inherent right, for a *bona fide* purpose, to retire its capital stock by purchase."

We are of opinion that under section 1286, *supra*, which grants to a corporation the privilege of purchasing its own stock from surplus profits, it is immaterial whether the surplus is obtained from the stockholders or earnings, and so long as the surplus exceeds the amount the company is bound to retain as capital, together with a sum sufficient to cover its debts and liabilities, such surplus profits may properly be used for the retirement of its stock, the term "surplus profits" implying the difference over and above the capital stock, debts, and liabilities, no matter how created, and that the evidence was sufficient to warrant the court in finding that the company in the instant case had a fund of $30,000 surplus with which to retire the Murphey stock.

But, if it can be said that this view is erroneous, and if we concede that this reasoning was wrong, that the corporation had exceeded its powers in retiring the stock and canceling said subscription without the consent of the stockholders, and that its acts in so doing were *ultra vires,* yet the fact that the corporation thus exceeded its delegated powers is not alone sufficient to avoid the contract, if there was a ratification, or if the corporation is estopped by reason of retaining the benefits of the transaction. After the sale of the Murphey stock to the corporation the identical stock was transferred to the Dallas parties; Murphey resigned as president; R. C. Ayres was elected in his

place; provision was made for six additional directors, pursuant to the scheme then under consideration; the capital stock of the corporation was reduced to one-half; and the name changed to the Amazon Fire Insurance Company, with headquarters at Dallas, Tex.   On August 24, 1911, which was subsequent to the Murphey transaction, there was a stockholders' meeting, at which the foregoing acts were ratified by the adoption of the amended charter, and the control of the company placed in R. C. Ayres and his associates, pursuant to the intent and spirit of the resolution which it is now claimed put in effect the *ultra vires* contract.  The defendant has retained all the fruits of this transaction, and is unable, by reason of its change in the name and character of its stock, to place the plaintiff *in statu quo*, although it offers in its answer to do equity. It is impossible to return Mr. Murphey to his office as president and put the corporation and himself *in statu quo*, which would be necessary before they could do equity.  No effort has been made by the stockholders to disaffirm the contract, but, on the contrary, their acts have the effect of ratifying such contract and estopping them from defending on the ground that the contract was *ultra vires*.   In the case of *Joseph v. Raff, supra,* the court in the syllabus says:

"When a solvent corporation purchases the stock of its president in consideration of his resignation, it and its subsequent creditors should be estopped to rescind the transaction after its insolvency and consequent inability to place him *in statu quo*."

That the corporation retained the benefit of the Murphey transaction is not denied; that it is impossible to place him *in statu quo* is apparent; and the court was justified in finding that the corporation received the stock from

George A. Murphey, canceled the same, reissued the same to R. C. Ayres, and received in payment therefor from Ayres $10,460, which said money had been mingled with the funds and assets of the said corporation; that it accepted the Murphey resignation and has elected R. C. Ayres as president, increased the number of directors, changed the name of the corporation, and reduced the par value of its capital stock 50 per cent.

It is said in *Spongberg v. First Nat. Bank*, 18 Idaho, 524, 110 Pac. 716, 31 L. R. A. (N. S.) 736, Ann. Cas. 1912A, 95:

" * * * The cashier or other officer of the bank may act without the scope of his authority and in a matter to which he is not authorized, and yet the bank may subsequently act in such a manner with reference to the particular transaction or subject-matter as to amount to a ratification of the unauthorized action of the cashier or other officer, or it may take such affirmative action in accepting the benefits and fruits of the transaction as to preclude it from thereafter questioning or denying the authority of the officer to act for it. It may also remain silent and inactive at a time when good faith would have impelled it to have spoken up and disclaimed the unauthorized act of its officer. In these and many other instances that might be mentioned the unauthorized action of the cashier or other officer of the bank may become, in presumption and contemplation of law, the act of the bank itself. Zane on Banks and Banking, sec. 105. *Martin v. Webb*, 110 U. S. 7, 3 Sup. Ct. 428, 28 L. Ed. 49." *First National Bank v. Kimberlands*, 16 W. Va. 555; *German Nat. Bank v. Grimstead*, 52 S. W. 951, 21 Ky. Law Rep. 674; *Fishkill Sav. Bank v. Bostick*, 19 Hun. (N. Y.) 354.

In the case of *Crowder State Bank v. Ætna Powder Co. et al.*, 41 Okla. 394, 138 Pac. 392, the court held:

·"Where a cashier of a bank makes a contract which is beyond his power and authority, but the bank by reason thereof secures a benefit or beneficial effect, it will not thereafter be heard to urge nonliability thereunder on the plea of *ultra vires*."

And, again, in the same case it is said:

"It may be considered as settled law in this state today that, when a corporation goes outside of its legitimate business and makes a contract, and that contract is executed, and the corporation has received the benefits of the contract, the courts will not listen to a plea of *ultra vires*."

We are not unmindful of the rule of law that, if the corporation had returned or tendered the benefit received as soon as it became known to the stockholders that an *ultra vires* contract had been entered into, there would not have been a ratification. No effort has been made by the directors or stockholders to place the plaintiff *in statu quo*, and the first intimation of a desire on their part to do so is the allegation in their answer that they offered to. return the stock and do equity; but this they are unable to do, owing to the admitted changed conditions subsequent to the Murphey transaction. In the instant case the contract was fully performed on the part of Murphey; the only thing remaining to be done to fully execute the contract being the payment of the notes which are the subject of this suit. The company having refused to do this, and without placing Mr. Murphey in the position he was before the contract was entered into, under the authority of *Crowder State Bank v. Ætna Powder •Co. et al., supra*, this court will not listen to the plea of *ultra vires*.

It is said in Thompson on Corporations (2d Ed.) sec. 2787:

" * * * Most of the American courts recognize an exception to the rule in cases where the contract has been executed by one of the parties and the other party retains the benefits therefrom. In these jurisdictions, where a contract not contrary to law or public policy has been fully executed on either side, and the party so executing on his part is suing to recover the agreed consideration therefor, the rule is that the other party will not be allowed to set up the defense that the corporation had no power to enter into the contract; and for the purposes of this rule it is immaterial whether the plaintiff or the defendant is the corporation.* * * 'In other words, a party to a contract who has received the consideration, benefits, or fruits of it—all that the other party agreed to do, to refrain from, or to give up—is estopped to set up the defense that the contract was in excess of the power of the corporation which was a party to it."

There are several assignments of error based upon the findings of fact and conclusions of law which are set forth in the brief with a mere suggestion of error; there being no argument or citations of authority. We have examined these assignments of error together with the evidence in support of such findings, and are convinced that there was sufficient evidence to support each finding of fact and conclusion of law based thereon.

The judgment should therefore be affirmed.

By the Court: It is so ordered.