[Civ. No. 22497. First Dist., Div. One. July 12, 1966.]

JOHN M. ENGLAND, as Trustee, etc., Plaintiff and Appellant, v. ANDREW G. CHRISTENSEN et al., Defendants and Respondents.

Jacobs & Hoffman and Harvey W. Hoffman for Plaintiff and Appellant.

Truett, Durham, Conn & Breiner, Harold J. Truett, Foley, Saler & Doutt, Lawrence D. Saler and Edmund B. Schultz for Defendants and Respondents.

SULLIVAN, P. J.—We hold in this case that the purchase by the corporation out of stated capital of the shares issued by it was not made to compromise a controversy between said corporation on the one hand and the selling shareholders on the other and was therefore unauthorized and unlawful. As we explain, the trial court erroneously interpreted the statutes authorizing such a purchase and imposing liability upon selling shareholders for their violation. While we deem it unnecessary to order a new trial, our holdings on the fundamental issue of the legality of the transaction under scrutiny and on the related issues of the liability, if any, of the selling shareholders and directors resulting from such transaction will require the court on remand to make adequate findings of fact and conclusions of law in conformity with our views. We therefore reverse the judgment with directions to the trial court as detailed *infra*.

In early 1958 defendant Andrew Christensen (Andrew) and his son, defendant Harold Christensen (Harold), were, and for several years prior thereto had been, partners operating a general contracting and cabinet making business in Sausalito under the name of A. G. Christensen and Son. Harold had become acquainted with defendant William Chapman in the fall of 1957 through their common interest in boating and in March of the following year the two Christensens, Chapman and defendant Victor I. Akers discussed going into the business of manufacturing and selling boats, in particular a certain type of catamaran as designed by Chapman.[1] Addi-

---

[1] A "catamaran" is defined by Webster's Third New International Dictionary as: "A boat with twin hulls or planing surfaces side by side; *esp*: a fast pleasure boat having two hulls joined by a framework that supports the mast or motor." Chapman had designed a modification of a catamaran intended to allow the boat to be operated in higher speeds with safety and with satisfactory performance on one motor.

tional meetings were held with other interested persons, after which a written preincorporation agreement was entered into on June 6, 1958. In June 1958 Christensen Manufacturing Company (Corporation, bankrupt), a California corporation, was incorporated and commenced actual operations on June 13, 1958 for the manufacture of catamaran outboard motor boats.

Initial preliminary discussions among the organizers contemplated their investment of money in the new business and the rental by the Corporation of the building owned by the Christensens and used by them in their contracting business. Subsequently the parties agreed that it would be more desirable to have the Christensens transfer their building and equipment to the Corporation in exchange for stock.

The authorized capital of the Corporation was $200,000, consisting of 20,000 shares of a par value of $10 each. Eventually, under a permit of the Corporation Commissioner[2] authorizing 12,000 shares, the Corporation issued 11,600 shares. Of these, 7,500 shares were issued under an original permit to the two Christensens and their wives in exchange for the real property and equipment (see fn. 2, *ante*) and $5,000 in cash; 500 shares to Chapman for his interest in the design and idea for the catamaran (see fn. 2, *ante*) ; and the balance to various persons for cash, making a total of 9,600 shares. Pursuant to amendments to the stock permit, 2,000 additional shares were issued for cash to four new investors[3] in February 1959, bringing the total to 11,600 shares. In all instances the certificates were deposited and held in the customary approved escrow pending further order of the commissioner. Thus the stated capital of the Corporation was $116,000. (Corp. Code, § 1900.[4])

At all times material herein, the board of directors of the Corporation consisted of seven members, including Andrew and Harold Christensen.[5] The two Christensens together with

[2]Among other things this permit authorized the issuance of: (a) 7,000 shares to Andrew, Harold and their respective wives as full and final consideration for their real and personal property, subject to specified liens, encumbrances, taxes and restrictions of record; and (b) 500 shares to Chapman as full and final consideration for his design of the catamaran.

[3]These were: Dr. Barbosa, Wilson Miller, Coleman Wexler and Donald Davis.

[4]Hereafter, unless otherwise noted, all section references are to the Corporations Code.

[5]The other directors were: Akers, Alpert, Wornum, Dinubilo and Chapman.

Wornum and Dinubilo apparently represented the "Christensen interests," so that, with four of the seven board members, Andrew was in control of the Corporation, conceding at the trial that he could "pretty much count on" 8,100 shares out of the total of 11,600 shares. Andrew was elected president of the Corporation, a position which he held until his final resignation; Harold was elected vice-president; Chapman, secretary; and Akers, treasurer. For a period of time the four new shareholders also appeared to be "informal" directors and even after their removal as such continued to have a voice in the corporate affairs.[6]

Sometime prior to April 1959, cash in various amounts totalling $33,000 was advanced to the Corporation by a group of investors[7] upon the understanding that they were to receive shares of stock when an appropriate permit had been obtained. The permit was issued but suspended a short time later. Nevertheless the $33,000 "was put into the general fund and used to pay bills and run day by day operations of the company." The amount was carried as a current liability on the Corporation's books and was still outstanding at the time of the transfer around which the present dispute revolves.

There was evidence that in the latter part of April or early May 1959 a number of meetings of the Corporation were held. An indication is found in the record that these were brought about by the suspension of the stock permit authorizing issuance of shares to the Professor Davis group. Some were business meetings, some duly noticed directors' and shareholders' meetings and some adjourned meetings. At almost all of them all directors except Wornum were present; frequently the shareholders who were not directors were present; on some occasions members of the Professor Davis group attended. At these meetings there were discussions about the issuance of stock to the Davis group. Andrew Christensen continued to voice opposition to such an application[8] because he was

---

[6] It is also noteworthy that the four new shareholders (see fn. 3, *ante*) "were allowed to . . . get on the board" because someone had so promised them if they bought stock. As a result the board seems to have been informally increased from seven to eleven members without any proper action in accordance with the by-laws. This practice prevailed for two or three months until it came to the attention of the Corporation's attorney who caused it to be discontinued.

[7] These interested persons were a group of 17 investors, hereafter referred to as the Professor Davis group.

[8] Originally Andrew directed Stanley Grydyk, the Corporation attorney, not to apply for a permit for 8,400 additional shares but only for 3,300 shares ($33,000) which would make the total stated capital $149,000 ($116,000 plus $33,000) thus giving Andrew continued control with the Christensen 7,500 shares.

adamantly opposed to the changes the new investors desired to make.

This position taken by Andrew and joined in by Harold, along with several smaller management decisions made by Andrew,[9] appears to have brought the dissension out into the open. Some of the Professor Davis group who attended meetings became disgruntled about Andrew's "being in the driver's seat." Threats were made to Andrew that if he didn't "get out" the new investors would demand immediate return of their $33,000, bring suit and attach; and that if Andrew did not agree to the new issue of shares, they would commence an action to dissolve the Corporation.

Finally, at one of the meetings the proposal was made to Andrew that he and the Christensen interests get out of the company entirely. This crucial decision that the Christensens be removed from the Corporation having been made sometime in early May, the following days were taken up with several meetings whose object was to determine the best method of removing them.

In seeking the best method of effecting their plan the directors several times consulted with Grydyk, the Corporation attorney, and also Mr. Bantz, a certified public accountant. It was finally decided that the Corporation would retransfer ownership of the land and buildings to the Christensens in exchange for the 7,500 shares of stock held by them. This plan had been arrived at prior to May 20, 1959, but was first formally evidenced by a resolution passed at the meeting of May 20, 1959, set forth in pertinent part in the footnote.[10]

---

[9]Some of the smaller decisions: Andrew testified that there was much bickering going on concerning the "running of the business." So, taking measures to protect his interest, Andrew took it upon himself to have Akers removed from his responsible position of writing corporate checks, discharging him as treasurer, and demoted Chapman, telling him "to go out on the road and sell." Further, Andrew was in a minority in voicing opposition to the building of a certain cruiser boat and also on the question of whether a certain metal strip should be used in construction of the boat.

[10]The resolution of May 20, 1959, states in pertinent part: "WHEREAS, a controversy exists with Andrew G. Christensen and Grace H. Christensen, his wife, and Harold P. Christensen and Dora J. Christensen who own 7,500 of said shares issued and outstanding and said controversy relates to the matters of management and issuance of additional stock as to which the minority shareholders believe they were given certain assurances by said majority shareholders and which the majority shareholders now deny; and

"WHEREAS, a balance sheet as of April 30, 1959 has been presented to the directors at this said meeting and based thereon, in the opinion of the directors, the corporation is now able to satisfy its debts and

Various other details had to be worked out. Among these were: (1) the securing of the corporation commissioner's consent to the release of the Christensen shares from escrow; (2) the securing of a guarantee of $11,000 of the $33,000 liability to the Professor Davis group by minority stockholders who were financially responsible; and (3) the negotiation of a lease from the Christensens back to the Corporation. In seeking consent to release of the shares from escrow, the attorney for the Corporation submitted a copy of the above resolution and a copy of a balance sheet at April 30, 1959. Consent was issued May 21, 1959.[11]

Harold and Andrew resigned their positions with the Corporation on May 24, 1959. Then, on June 3, 1959 the Corporation delivered to the Christensens a grant deed to the real property, in return for which the Christensens delivered over the 7,500 shares to the Corporation for cancellation. This consummated the purchase by the Corporation out of stated capital of the 7,500 shares of the Christensen stock. Bankruptcy soon followed.

On November 16, 1959, an involuntary petition in bankruptcy was filed with the clerk of the United States District Court. On January 12, 1960 the Corporation caused to be filed with said court its consent to the entry of an order of adjudication which, on January 14, 1960, was made and filed in said court adjudging the Corporation to be bankrupt. On March 1, 1960 plaintiff John M. England was appointed trustee in bankruptcy of the bankrupt's estate. During the month of December 1959, prior to his being appointed trustee, plaintiff

liabilities when they fall due and will not by purchasing and redeeming said shares for the consideration hereinafter set forth be rendered unable to satisfy its debts and liabilities when they fall due and further, because said Christensens have guaranteed payment of $11,000.00 of the corporation's obligations by agreeing to a distribution of land and building subject to a deed of trust; and

"WHEREAS, the corporation and its shareholders will be benefited by the purchase and redemption of said 7,500 shares.

"Now, THEREFORE, IT IS RESOLVED that the officers of this corporation are hereby authorized and directed to purchase from [the Christensens] 7,500 shares . . . of the capital stock of the corporation. . . ."

[11]There was received in evidence a copy of the commissioner's "file memo" which in pertinent part and under the caption "Memorandum of Findings" stated: "Due to a controversy between the corporation and the Christensens, subject has elected to buy back out of stated capital under Corporations Code Section 1706(a) all the shares held by the Christensens. Stated capital will be reduced accordingly and the balance of the aggregate par value of shares to be reacquired over the price (about $7.20 per share) to be paid therefor will be credited to reduction surplus. Subject's shareholders have consented unanimously to this course of action. Recommended."

"ran the business, processing and building boats." Then, after the Corporation was adjudicated bankrupt, plaintiff, following the usual procedures, sold the assets of the Corporation, receiving therefor $17,391.

On October 13, 1961, plaintiff as trustee commenced the instant action setting forth two separately stated causes of action: the first against the Christensens as sellers of shares improperly purchased by bankrupt out of stated capital; and the second against certain directors for having acted negligently in causing such purchase to be made. Without detailing the findings of fact at this point, it is sufficient to say that the court found favorably to all defendants on all material issues and concluded that defendants did not, nor did any of them, violate any of the applicable provisions of the Corporations Code. Judgment was entered accordingly. This appeal followed.[12]

The initial issue before us is whether the trial court properly determined that the purchase of the Christensen shares out of stated capital did not offend statutory precepts governing such transactions. The court found that on May 20, 1959, the date of the directors' resolution authorizing the purchase, "a controversy existed between the corporation and some of its shareholders, which said controversy adversely affected the corporation and its business" and that such resolution was passed "In order to resolve said controversy. . . ."

The General Corporation Law (§§ 100-6804) prohibits a corporation from purchasing, directly or indirectly, any shares issued by it except under the circumstances specifically set forth in the Corporations Code (§ 1705).[13] Subject to the limitation contained in section 1708,[14] a corporation "may purchase, out of stated capital or out of any surplus, shares issued by it . . . in any of the following cases: (a) To collect or compromise in good faith a debt, claim, or *controversy* with any shareholder." (Italics added.) (§ 1706.) Actually our

---

[12]Respondents herein are: Andrew and Harold and their wives; Dinubilo, Akers and Alpert. The two last mentioned are together represented by separate counsel and have filed a separate brief on this appeal.

[13]Section 1705 in pertinent part provides: "A corporation shall not purchase directly or indirectly any shares issued by it or by any corporation of which it is a subsidiary, except as authorized by Section 1706, Section 1707, or Section 1716."

[14]Section 1708 in pertinent part provides: "A corporation shall not purchase or redeem shares issued by it . . . in any case when there is reasonable ground for believing that the corporation is unable, or, by such purchase or redemption, will be rendered unable, to satisfy its debts and liabilities when they fall due, except such debts and liabilities as have been otherwise adequately provided for."

problem is two-fold in nature: initially we must define the scope of permissible action under section 1706, subdivision (a); secondarily, we must determine whether, in the light of the familiar rules of appellate review,[15] substantial evidence supports the trial court's finding that the instant transaction was such a one as set forth in the statute. However, no case has been cited to us, nor has any been found, which is squarely decisive of the problem at hand.

"The fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law." (*Select Base Materials, Inc.* v. *Board of Equalization* (1959) 51 Cal.2d 640, 645 [335 P.2d 672] and cases there cited; *East Bay Garbage Co.* v. *Washington Township Sanitation Co.* (1959) 52 Cal.2d 708, 713 [344 P.2d 289]; *Brodsky* v. *Seaboard Realty Co.* (1962) 206 Cal.App.2d 504, 516 [24 Cal.Rptr. 61].) Statutes should be construed so as to be given a reasonable result consistent with the legislative purpose. (*Kusior* v. *Silver* (1960) 54 Cal.2d 603, 620 [7 Cal.Rptr 129, 354 P.2d 657]; *County of Alameda* v. *Kuchel* (1948) 32 Cal.2d 193, 199 [195 P.2d 17]; *Estate of Patell* (1963) 221 Cal.App.2d 376, 382 [34 Cal.Rptr. 512].) It is a cardinal rule that in the interpretation of particular words, phrases or clauses in a statute, the entire substance of the statute or that portion relating to the subject under review should be examined in order to determine the scope and purpose of the provision containing such words, phrases or clauses. (*Wallace* v. *Payne* (1925) 197 Cal. 539, 544 [241 P. 879]; *County of San Mateo* v. *Consolidated Farms, Inc.* (1959) 169 Cal.App.2d 735, 738-739 [337 P.2d 840]; *Christensen* v. *Slawter* (1959) 173 Cal.App.2d 325, 330 [343 P.2d 341, 74 A.L.R.2d 567].) Words used in a statute "must be construed in context, keeping in mind the nature and obvious purpose of the statute . . ." (*Johnstone* v. *Richardson* (1951) 103 Cal.App.2d 41, 46 [229 P.2d 9].) Applying these principles we conclude that the trial court did not correctly interpret the meaning of "controversy" as used in section 1706, subdivision (a).

"It is the theory of the California General Corporation Law that as a general rule the purchase by a corporation of its own shares should not be allowed except out of earned

[15]See *Estate of Arstein* (1961) 56 Cal.2d 239, 240 [14 Cal.Rptr. 809, 364 P.2d 33]; *Primm* v. *Primm* (1956) 46 Cal.2d 690, 693 [299 P.2d 231]; *Estate of Bristol* (1943) 23 Cal.2d 221, 223 [143 P.2d 689]; *Crawford* v. *Southern Pac. Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].

surplus which would be available for distribution, as cash dividends. The withdrawal of assets by a shareholder upon a sale or surrender of his shares has the same effect *upon creditors* as the payment of a dividend.'' (Italics added.) (1 Ballantine & Sterling, California Corporation Laws (4th ed.) p. 299; *Tiedje* v. *Aluminum Taper Milling Co.* (1956) 46 Cal.2d 450, 453 [296 P.2d 554]; 34 Ops. Cal. Atty. Gen. (1959) 191, 192.) ▆ The pertinent sections of the law (§§ 1705-1708) were ''enacted for the benefit of the corporation as a whole, *its creditors* and stockholders other than the participating stockholder.'' (Italics added.) (*Tiedje* v. *Aluminum Taper Milling Co., supra,* at p. 455; *Armstrong Manors* v. *Burris* (1961) 193 Cal.App.2d 447, 455 [14 Cal.Rptr. 338].) ▆ ▆ ▆ present sections have relaxed the stricter prohibition of a predecessor statute,[16] it is nevertheless manifest that they have retained a general and complete prohibition against a corporation's purchase of its own shares, except in those particular instances specified in the code (§ 1705). The present law, therefore, continues a vigilant and protective influence over corporate capital since, as the above authors point out, a corporation's power to purchase its own shares is subject to much abuse.[17] We are therefore not persuaded by the argument of defendants Akers and Alpert (for which incidentally no authority is cited) that we should give the statute at hand a liberal construction in order to satisfy its object and purpose. On the contrary, it seems to us that such a construction impedes rather than subserves the legislative intent.

---

[16]See former Civil Code § 309 as in effect prior to 1929. See *Schulte* v. *Boulevard Gardens Land Co.* (1913) 164 Cal. 464, 468 [129 P. 582, Ann. Cas. 1914B 1013, 44 L.R.A. N.S. 156] holding that in view of former Civil Code § 309 a corporation was not authorized to purchase its own shares ''since the result would be to illegally withdraw, and pay to a stockholder a part of the 'capital stock.' '' In 1929 former Civil Code § 354, enumerating the powers of a corporation, was amended to confer the power to purchase its own shares under specified circumstances. (Stats. 1929, pp. 1270-1271.) Part of this revision is now found in identical language in subdivision (a) of § 1706.

[17]''It has been urged by various writers on the subject that the policy of the law as to protection of capital is not consistently carried out and that many abuses are made possible by permitting a corporation to deal in its own shares. There is no doubt that such power 'is a fruitful source of unfairness, mismanagement and corruption.' The purchase of its own shares may be a method of secret withdrawal and reduction of current assets to the prejudice of creditors and holders of prior securities, a method of favoritism to insiders, or of speculation with the corporate funds and the creating of artificial market prices. The California provisions limiting such purchases and prescribing their financial and accounting effects are most elaborate. The usual provisions have been considered to be inadequate.'' (Ballantine & Sterling, *op. cit.,* p. 298.)

Generally speaking, a controversy means a dispute, disagreement or quarrel.[18] Fairly read, we think that section 1706, subdivision (a) as here pertinent means that a corporation can purchase its own shares in order to compromise a controversy or dispute of the *corporation* with any *shareholder*, that is a controversy existing between the corporation on the one hand and the shareholder on the other. A reference to the remaining language of section 1706, subdivision (a) confirms this interpretation. Clearly the collection or compromise of a debt or claim means one held or asserted by the corporation on the one hand against the shareholder on the other. (See *Schreiber* v. *San Joaquin Exploration Co.* (1954) 125 Cal.App.2d 171, 174 [270 P.2d 19].) The statute, of course, does not expressly provide for the compromise of a controversy or dispute among the shareholders themselves. Nor, when read in context, does the pertinent language give any clue of such an implication or intendment. In view of the legislative purpose and the statutory history, we observe that if the Legislature had intended the word ''controversy'' to have the broad scope urged by defendants so as to embrace disputes or disagreements among the shareholders themselves, it could have easily said so.

We therefore reject the argument made by defendants Akers and Alpert under their theory of liberal construction that the ''controversy'' language in the statute ''would certainly cover the wrangling which threatened the corporate existence.'' Other remedies are available in such a crisis. (See §§ 4650, 4651 (subds. (c) to (f), inclusive) dealing with involuntary proceedings for dissolution; see *Buss* v. *J. O. Martin Co., Inc.* (1966) 241 Cal.App.2d 123 [50 Cal.Rptr. 206].) Indeed, Ballantine & Sterling, authorities highly respected by the profession, write persuasively to the same effect: ''This clause [§ 1706, subd. (a)] as to collection or compromise *hardly extends to attempts to avoid internal dissension.* It should not be extended into a permission to buy out of stated capital the shares of any undesirable or troublesome shareholders who may quarrel with the policy of the management, or the shares of shareholders who want information which the directors think it prudent to withhold. If a group of shareholders wish unopposed control of the corporation they should purchase the shares of the opposition as individuals and not spend the funds of the corporation in

---

[18]See Webster's Third New International Dictionary; Roget's International Thesaurus.

keeping themselves in power." (Italics added.) (Ballantine & Sterling, *op. cit.*, p. 305.)

It is also noteworthy, as the above authorities point out, that section 1706, subdivision (a) "is intended as a statutory codification of a class of cases which has been long recognized." (Ballantine & Sterling, *op. cit.*, pp. 304-305.) Cited as support for such proposition are the following four cases: *Ralston v. Bank of California* (1896) 112 Cal. 208 [44 P. 476], *Stewart v. Stewart Hotel Co.* (1917) 33 Cal.App. 167 [164 P. 620], *Thomas v. Wentworth Hotel Co.* (1911) 16 Cal.App. 403 [117 P. 1041, 1046] and *Edwards v. California Sweet Potato Corp.* (1930) 104 Cal.App. 715 [286 P. 733]. None of these cases can be read as authorizing a corporation to purchase the majority shares merely to alleviate a management dispute.[19] While other leading textwriters, in dealing with the problem generally, state that a corporation may acquire its own shares in the absence of an express restriction in order to compromise a disputed claim against the holder, they do not extend such power to situations involving management disputes or internal dissension. (See 6A Fletcher, Cyclopedia Corporations, §§ 2856 et seq., esp. § 2857; 5 Thompson on Corporations (3d ed. 1927) §§ 4085-4093, esp. §§ 4088 and 4093.) Defendants' reliance on the former authority (*id.*, § 2857) as supportive of their position here is misplaced.

We hold that section 1706, subdivision (a) in its reference to a compromise of a controversy means a controversy or dispute between the corporation on the one hand and a shareholder on the other and does not extend to or embrace controversies or disputes between the shareholders themselves or internal dissension among them in respect to the corporate affairs. The trial judge appears to have expanded the meaning of the statute so as to make it applicable to situations

---

[19]But see the unfortunate dicta in *Stewart* where the court said: "In the *Schulte* case [*Schulte v. Boulevard Gardens Land Co.* (1913) 164 Cal. 464 (129 P. 582, Ann.Cas. 1914B 1013, 44 L.R.A. N.S. 156)], after having stated the general rule, the court said: 'The want of power to buy its own stock does not prohibit a corporation from taking the stock in satisfaction of a loan or where otherwise necessary to save itself from loss.' What did the court mean when it said that a corporation *not only* might take its stock in satisfaction of a loan *or when otherwise necessary to save itself from loss?* We feel authorized to assume that the court meant to say that circumstances might arise other than such as appeared in those two cases where the corporation would be justified in taking over the shares of one of its stockholders, and that each case must be governed by its own peculiar facts; that the general rule, though well settled in this state, is not inflexible and unyielding." (33 Cal.App. at p. 184.)

of internal dissension among the shareholders.[20] We conclude that his interpretation to this effect was erroneous.

Defendants' cited cases do not persuade us to a contrary conclusion and it would serve no useful purpose to discuss them in detail. *Morgan* v. *Lewis* (1888) 46 Ohio St. 1 [17 N.E. 558] and *Murphy* v. *Panton* (1917) 96 Wash. 637 [165 P. 1074] merely discuss the general exception that a corporation may take its own stock in compromise of a debt or claim. While *Morgan* involved the retransfer of property to the shareholder for his stock previously issued him for it, the basis of the transaction was a rescission of the original agreement because of a defect in the property. *Murphy* actually involved the permissible cancellation of a stock subscription. *Cawthon* v. *Bancokentucky Co.* (D. Ky. 1931) 52 F.2d 850 is to the same effect, since it rests approval of the purchase on rescission of the original agreement, thus holding there was never a valid sale in the first place. *Karasik* v. *Pacific Eastern Corp.* (1935) 21 Del.Ch. 81 [180 A. 604] involved stockholders' suits seeking an accounting against officers and directors for corporate mismanagement and the compromise of such claims by having such persons transfer their stock to the corporation, thus also involving compromise of a claim or debt.

*Joseph* v. *Raff* (1903) 82 App.Div. 47 [81 N.Y.S. 546] involved an arrangement under which the president of a corporation, having been initially solicited to become interested in the company upon its incorporation under an agreement to take stock and be elected president, thereafter tendered his resignation, retransferred and was paid for his stock, cancelled his employment contract and received his back salary and certain other money as liquidated damages. The court said: ''This being for the best interests of the company,

---

[20]We may consider the trial judge's opinion for the purpose of ascertaining the process of reasoning by which he arrived at his conclusion. (*Oldis* v. *La Societe Francaise* (1955) 130 Cal.App.2d 461, 474-476 [279 P.2d 184]; *T W M Homes, Inc.* v. *Atherwood Realty & Inv. Co.* (1963) 214 Cal.App.2d 826, 849 [29 Cal.Rptr. 887].) In his memorandum of decision the trial judge states: ''[T]here does not appear to be a convincing authority on a definition of what is a 'controversy' within the meaning of Section 1706(a) of the Corporations Code. It is true that Professor Ballantine indicates that this clause as to collection or compromise hardly extends to attempts to avoid internal dissension. Nevertheless, there must be some significance to the use of the word 'controversy,' for the section mentions 'debt' and 'claim.' On the other hand, the Commissioner of Corporations has seen fit to interpret this phrase as having application to the instant case.'' The rationale of the court is further reflected in its finding on the ''controversy'' issue (finding No. 2) which we discuss *infra.*

it was proper for the directors to endeavor to secure the defendant's resignation; . . . It was also lawful for him to refuse to resign his management of the company *unless his stock was taken off his hands.*'' (Italics added.) (81 N.Y.S. at p. 552.) The company was incorporated under New Jersey law and it cannot be ascertained from the opinion whether such applicable law was similar to section 1706, subdivision (a). Certainly the case does not support the ''internal dissension'' theory of defendants herein.

Nor are the two Delaware cases relied upon by defendants persuasive. *Martin* v. *American Potash & Chemical Corp.* (1952) 33 Del.Ch. 234 [92 A.2d 295, 35 A.L.R.2d 1140] and *Kors* v. *Carey* (1960) 39 Del.Ch. 47 [158 A.2d 136] both rest their approval of the purchase by a Delaware corporation of its own shares on clear statutory authority which has a far broader sweep than the California statute before us. *Germann* v. *Farmers Tobacco Warehouse Co.* (1935) 260 Ky. 249 [84 S.W.2d 82] is distinguishable from the case at bench because the purchase was consented to by *all shareholders and creditors,* the court recognizing that while the applicable Kentucky statute prohibited the purchase, nevertheless in the light of its purpose to protect shareholders and creditors, ''it was not intended as a limitation upon the power or means of reducing the capital when there could be no injurious consequence and *the transaction was unanimously approved by all of those who could in any way be affected.*'' (Emphasis added.) (84 S.W. 2d at p. 84.)

Turning to the evidence which we view in the light most favorable to respondents (*Marshall* v. *Marshall* (1965) 232 Cal.App.2d 232, 236 [42 Cal.Rptr. 686] and cases there cited), we find nothing showing that the ''controversy'' here involved was one between the Corporation on the one hand and the Christensens on the other. The record contains not a particle of evidence indicating that the ''controversy'' was anything other than ''internal dissension'' among the shareholders. The trial court's finding previously set forth is without any support whatsoever in the record. We therefore conclude that the validity of the purchase by the Corporation of the Christensens' shares is not sustained by the law or the evidence. In view of this conclusion we need not determine whether the compromise was made ''in good faith'' (§ 1706, subd. (a)) or satisfied the further limitations on the Corporation's power to purchase as prescribed in section 1708. On the record before us the purchase was unlawful since it did not

fall within any of the permissible exceptions set forth in section 1706.

As indicated by its opinion (see fn. 20, *ante*), the trial court seems to have been under the impression that the purchase was lawful because the corporation commissioner passed upon its legality when he consented to the release of the Christensens' shares from escrow.[21] There was also testimony to the effect that the procedure for the release of the shares entailed a determination that the transaction was proper.[22] Notwithstanding such testimony we agree with plaintiff that the commissioner could not enlarge the powers of the Corporation to purchase its own shares. The shares owned by the Christensens were required to be held in escrow in accordance with the commissioner's regulations. (See Cal. Admin. Code, tit. 10, §§ 407-421.) An application for release of securities from escrow must set forth certain information (*id.* § 414) and, according to section 417, "Based upon the application and exhibits, the examination of the commissioner shall be for the purpose of determining whether or not a release of the securities from escrow would be fair, just, and equitable, a disposal thereof might work a fraud on any purchaser or other party concerned, and whether the reason for the escrow condition no longer exists." The foregoing regulations do not invest the

[21]It is not clear whether the court applied this rationale in making its findings as to the existence and compromise of a "controversy" (findings Nos. 2 and 3) or in making its findings as to the good faith of defendant directors (findings Nos. 4, 5 and 10) and selling shareholders (finding No. 10). It is apparent, however, that the court regarded the pertinent evidence as significant since it made the following finding: "That a full and complete disclosure was made to the Commissioner of Corporations, including the balance sheet dated April 30, 1959, and said Commissioner of Corporations did grant said permit." The pertinent documentary evidence consists of the commissioner's consent dated May 21, 1959 (defendant's exh. 14) authorizing the escrow holder to deliver the Christensen shares to the Corporation and the commissioner's file memo dated May 22, 1959 (defendant's exh. 17) already set forth by us in relevant part (see fn. 11, *ante*). These were produced pursuant to a subpoena duces tecum by Deputy Corporation Commissioner Olcomendy, called as a witness by defendants.

[22]While Mr. Olcomendy had nothing whatsoever to do with the particular application, he described the procedures involved thusly: that his office would have made a determination as to the legal propriety of the application; that it would have determined whether the statutory requirements for a repurchase could be met; and that if there were no legal basis for the purchase an "order of cancellation" would have been issued. On cross-examination, Olcomendy stated that the purpose of an escrow condition was to prevent shares from being circulated among the public in certain instances and that when an application is made to release them from escrow, his office *relies upon the application* without making an independent audit or verification.

commissioner with power to treat as a permitted ''controversy'' under section 1706, subdivision (a) a transaction which was not in fact such a controversy. According to the commissioner's file memo (defendant's exh. 17; see fn. 11, *ante*), the purchase for which consent to release was sought is recited to be ''Due to a controversy *between* the corporation *and* the Christensens, . . .'' (Italics added.) No such controversy existed and a recitation to that effect cannot establish such existence; nor can the ensuing consent operate as an approval of the underlying transaction binding on the Corporation's creditors.

Having concluded that the transaction was unlawful, we must now determine what, if any, liability attached to (a) the selling shareholders and (b) the directors. As to the former, section 1715 provides: ''When a corporation, in violation of any provision of this division, purchases directly or indirectly shares issued by it, or by any corporation of which it is subsidiary, any shareholder or owner of shares who sells such shares with knowledge that the corporation is the purchaser and with *knowledge of facts indicating the impropriety of the purchase* is liable to the corporation or its receiver, liquidator, or trustee in bankruptcy to the extent of the payments received therefor, with interest thereon at 7 percent a year until paid, and for the unpaid balance of the subscription price due thereon, if any.'' (Italics added.) This section was enacted in 1947 (Stats. 1947, ch. 1038, p. 2337) upon the enactment of the Corporations Code which consolidated and revised the law relating to corporations. It has remained unchanged since that date. It was based on former Civil Code section 365 as added by Statutes 1931, chapter 862, section 2, page 1816, amended by Statutes 1933, chapter 533, section 66, page 1398 and by Statutes 1945, chapter 1301, section 2, pages 2451, 2452. The predecessor section as in effect in 1931 imposed liability upon the selling shareholder to the corporation, its receiver or trustee in bankruptcy ''to the extent of payments made therefor [by the corporation for the purchase of its share] . . . for the payment of existing liabilities of the corporation at the time of such sale'' irrespective of the selling shareholders' lack of knowledge that the corporation was the purchaser or that the purchase was unauthorized. (See Ballantine & Sterling, *op. cit.*, § 161, p. 322.)

As amended in 1933, former Civil Code section 365 imposed such liability upon the shareholder or owner if (1) he sold the

shares "knowing that the corporation is the purchaser with knowledge of *facts indicating the impropriety* of such purchase . . ." (italics added) *and* (2) the corporation was adjudged insolvent or bankrupt in a proceeding begun within one year after the unlawful purchase. The latter requirement conditioning liability upon the adjudication of insolvency or bankruptcy was eliminated in 1945 leaving the section as thus amended substantially as the successor section 1715 reads today. As pointed out previously, Civil Code section 365 was repealed in 1947 (Stats. 1947, ch. 1038, p. 2440) and replaced by Corporations Code section 1715 without substantial change in language. Thus the legislative history shows initially the imposition of liability on the selling shareholder irrespective of his knowledge of the transaction by which the corporation purchased his shares and thereafter and consistently since 1933 the imposition of liability *if* he has knowledge of the corporation's being the purchaser *and* of facts indicating the impropriety of the purchase. Since 1933, therefore, in the place of absolute liability on the selling shareholder, there has been liability dependent upon two conditions based on his knowledge of the transaction.

 Although no case appears to have interpreted the term "impropriety" used in section 1715, we find no difficulty in ascertaining its meaning. Read in the context of the section and in relation to the opening words referring to purchases in violation of any provision of division one of the code (§§ 100-6804), "impropriety" as used in conjunction with "purchase" means its quality or state of being in violation of or unauthorized by law. We do not agree with defendants that as used here the word can have no other legal significance than that "the purchaser is in some manner or means acting contrary to good, acceptable, ordinary, reasonable, prudent conduct."[23] In a word, "impropriety of the purchase" means that it was unlawful or illegal.

---

[23]We also reject the dictionary definition offered by defendants in *Sultan Turkish Bath, Inc.* v. *Board of Police Comrs.* (1959) 169 Cal. App.2d 188 [337 P.2d 203], a case not in point at all, involving the use of the word "improper" in an ordinance prescribing standards for the operation of Turkish baths. It is obvious that in *Sultan* the word "improper" is used in an entirely different context. (*Johnstone* v. *Richardson, supra,* 103 Cal.App.2d 41, 46.) If we were to advert to a dictionary definition in the case at bench we would think that "impropriety" means "the quality or state of being improper" and that "improper" as a first definition, means "not accordant with fact, truth, or *right procedure.*" (Italics added.) (Webster's Third New International Dictionary.)

Nor has any case been cited to or discovered by us which construes the phrase "with knowledge of facts indicating the impropriety of the purchase." Clearly the statute does not say merely "with knowledge of the impropriety of the purchase" as distinguished from "knowledge of *facts indicating* the impropriety." (Italics added.) As we said, "impropriety" of the purchase means that it was unlawful. ▮ The selling shareholders are of course chargeable with knowledge of the law prohibiting a corporation from purchasing its own shares except under the circumstances and subject to the conditions specified in the Corporations Code. (See §§ 1705, 1706, 1708; *Tiedje* v. *Aluminum Taper Milling Co., supra,* 46 Cal.2d 450 citing *Stevens* v. *Boyes Hot Springs Co.* (1931) 113 Cal.App. 479, 483 [298 P. 508].) ▮ The statute before us does not make the liability of the selling shareholder dependent on whether or not he knew the purchase was illegal. To read into it such a general absolution from liability would be to permit the shareholder to circumvent restrictions upon the withdrawal of corporate assets whenever he is unaware or professes to be unaware of the illegality of the purchase and thus to frustrate the statutory scheme of protecting corporate capital for the corporation, its shareholders as a whole and its creditors.

The crucial factual issue in the case at bench is whether or not the selling shareholders had knowledge of *the facts* which made the Corporation's purchase of its own stock a violation of law. (*Tiedje* v. *Aluminum Taper Milling Co., supra,* 46 Cal.2d 450, 454.) There is, and can be, no dispute as to the fact that the sellers knew that the Corporation was the purchaser. Nor can it be disputed that the purchase was made from stated capital. The nucleus of the illegality is that such purchase out of stated capital was *not* made in order to compromise a controversy between the Corporation and the selling shareholders but appears to have been part of an attempt to eliminate general dissension among all of the investors, nonshareholders (e.g., Professor Davis group) as well as shareholders.

However, the trial court made no finding as to whether or not the selling shareholders had knowledge of facts indicating the impropriety of the purchase. Instead it merely found that they "had no knowledge of any *impropriety* in the subject transaction." (Italics added.) This was not the issue. If the selling shareholders, admittedly aware of the fact that the

Corporation was purchasing their shares, knew that there was no dispute or claim between themselves and the Corporation which was being settled or compromised by the purchase, then they had knowledge of facts indicating that the purchase was unauthorized. Their state of mind as to the impropriety of the transaction was immaterial since knowing the facts they were chargeable with the knowledge that the law prohibited the transaction. ■■■ There is abundant evidence in the record bearing upon the participation of Andrew and Harold Christensen in the affairs and day-to-day conduct of the business from which it may be inferred that these two shareholders had the requisite knowledge alluded to above. It is of course not within our province to pass upon the weight and credibility of this testimony and we must therefore remand the case for a finding on this issue. In making such finding the trial court should consider and determine whether the wives of Andrew and Harold, defendants Grace and Dora Christensen, had such requisite knowledge as to affix liability upon them as well.[24] If it is found that the selling shareholders had such knowledge then they are liable under section 1715.

We turn to examine the question of the directors' liability as asserted in plaintiff's second stated cause of action.[25] This cause of action was based on sections 824 to 826[26] and alleges that the defendants there involved ''in causing the purchase of the Christensens' stock by bankrupt in violation of Section

[24]It was admitted at the pretrial conference that Grace and Dora were also shareholders. This is consistent with the original stock permit which authorized issuance of shares to all four Christensens.

[25]While this cause of action named as defendant directors Akers, Alpert, Chapman, Dinubilo, Davis and Wexler, it appears that the action was dismissed as to Davis and Wexler at the pretrial conference and as to Chapman at trial. The parties seem to be in agreement, and indeed the court found, that Andrew and Harold Christensen were directors. Defendants Christensens state before us that Andrew and Harold (but not their wives) appear here in dual capacities of directors and shareholders. There is no finding below expressly stating who were the defendant directors before the court. However, in view of the statements in the briefs, we regard the question of the directors' liability as involving Andrew, Harold, Dinubilo, Akers and Alpert.

[26]Section 824 provides ''Except as provided in this division, the directors of a corporation shall not authorize or ratify the purchase by it of its shares, or declare or pay dividends, or authorize or ratify the withdrawal or distribution of any part of its assets among its shareholders.''

Section 825 provides that ''In case of any wilful or negligent violation of Section 824,'' the directors, except those causing their dissent to be entered on the minutes, ''are jointly and severally liable to the . . . trustee in bankruptcy, . . .''

Section 826 provides that an action to enforce the directors' liability may be brought by the trustee in bankruptcy, among others.

824 . . . acted in a negligent manner."[27] The court found that the board of directors "in passing said resolution, acted in good faith and in reliance upon the balance sheet dated April 30, 1959, and did otherwise conduct themselves as ordinary, reasonable, prudent men . . . [and] did not act willfully or negligently." (Findings Nos. 4 and 5.)[28]

In essence, therefore, the trial court determined that the directors were not liable because they relied in good faith on the balance sheet dated April 30, 1959. This is the focal point of the issue on appeal. Plaintiff contends that the "good faith" of the directors in authorizing the purchase is no defense. Defendant directors argue that the trial court properly found that they acted in good faith reliance on the balance sheet and were therefore not negligent and that any claim that they wilfully violated section 824 is "almost too absurd to consider." As previously noted (see fn. 27, *ante*), plaintiff makes no such claim.

Defendants' position and the trial court's holding rest on section 829 quoted in the footnote.[29] The crucial balance sheet on the basis of which immunity from liability is now sought to be sustained was prepared by Grydyk. Although engaged in the practice of law but not of accountancy, Grydyk testified that he was also licensed as a certified public accountant since 1948[30] and had consulted about the balance sheet with Mr. Bantz, a certified public accountant. This was the balance sheet which was furnished the directors in connection with the proposed purchase of the Christensen shares and a copy of which together with a copy of their resolution was presented to the Corporation Commissioner with the application for release of the shares from escrow. There is evidence that the document correctly reflected the then financial condition of the

[27]The complaint does not charge a wilful violation of § 824 and the pretrial conference order designates the issue to be one of the directors' negligence.

[28]The court also found that "all of the defendants acted in good faith, and there was no impropriety in their conduct in the subject transaction." (Finding No. 10.) However, it is difficult to tell whether this finding was intended to relate to the defendant *directors*.

[29]Section 829 provides "A director is not negligent within the meaning of Section 825 if he relies and acts in good faith upon a balance sheet or profit and loss statement of the corporation furnished or exhibited to him by the president or the officer of the corporation having charge of or supervision of its accounts, or certified to be correct and according to the books of the corporation by a public accountant or firm of public accountants selected with reasonable care."

[30]The record seems to imply, although it does not specifically state, that Mr. Grydyk was licensed in California.

Corporation and, as defendants urge before us, showed the assets and liabilities to be in a ratio of about one and one-half to one. An examination of the record discloses substantial evidence that the directors relied upon the balance sheet as explained to them by Mr. Grydyk.

This testimony and documentary evidence would be conclusive upon us on the issue of liability if the only question for determination was whether a controversy otherwise within the ambit of the statute had been compromised *in good faith* (§ 1706, subd. (a)) or whether there was *reasonable ground for believing* that the Corporation was unable, or by such purchase would be rendered unable, to satisfy its debts and liabilities when they fell due (§ 1708). Neither of these questions constitutes the crucial issue now engaging our attention. The central issue here is this: Did the directors, contrary to the mandate of section 824 (see fn. 26, *ante*), authorize the purchase of shares in a manner "Except as provided" in division one of the code. Division one (§§ 100-6804) as we have seen includes sections 1705 and 1706. We have already concluded that the instant purchase was illegal because it was not made to compromise a "controversy" within the meaning of section 1706, subdivision (a). The purchase was in violation of sections 1705 and 1706 and therefore of section 824. The question to be determined therefore is whether the violation of section 824 was negligent. (§ 825.) Defendant directors' reliance on the balance sheet of April 30, 1959 furnishes no answer per se to this inquiry. The balance sheet discloses no controversy between the Corporation and the selling shareholders. Indeed, if anything, the balance sheet is susceptible of the inference that there was *no such controversy* and is on this point unfavorable to defendant directors.

 Contrary to plaintiff's claim made at oral argument, the foregoing violations of sections 1705 and 1706, and thus of section 824, do not constitute negligence as a matter of law. The statute (§ 825) specifically provides that the violation must be wilful or negligent before liability will be imposed and thus implies by its wording that there may be violations of section 824 for which the directors will *not* be liable. (Ballantine on Corporations (1946), § 253, pp. 591-593; Ballantine & Sterling, *op. cit.*, § 84, pp. 157-158;[31] 12 Fletcher, *op. cit.*,

---

[31]As the authors point out in a footnote, under former Civil Code § 309 as in effect prior to 1929 the liability of directors for unauthorized dividends or withdrawals of the capital stock did not depend on their wilfulness or negligence.

§ 5432, p. 190; 13 Cal.Jur.2d, Corporations, § 346, pp. 118-119.) ▇▇▇ Directors are therefore not liable for violations of section 824 if they acted in good faith or with due care. (Ballantine, *op. cit., supra.*) Generally speaking, this question of negligence is a question of fact for the determination of the trier of fact.

As we have explained, the trial court, although finding that the directors did not act wilfully or negligently, did not actually determine the question of their negligence posed above. This is because the court also determined that the purchase of the shares was made to compromise a controversy within the meaning of section 1706, subdivision (a), a finding which, as we have explained, is not sustained by the record. It is obvious then that the court did not determine whether the directors acted negligently in approving a purchase which was unauthorized because there was *no* controversy between the corporation and the selling shareholders. A reference to the reasoning of the court as disclosed by its memorandum opinion confirms our conclusion in this respect. On remand, therefore, the court should determine in view of our conclusions that the controversy sought to be compromised was not one within the meaning of section 1706, subdivision (a) and that the purchase of shares was therefore unlawful, whether or not such violation was negligent.

We find nothing in the record impelling us to order a new trial. The case was fully tried and we apprehend no necessity to take further evidence. Nevertheless in view of its previous determinations, the court may deem it necessary or advisable to receive additional evidence and should not be foreclosed from so doing. Under the circumstances it is appropriate to remand the cause with directions to the trial court to make adequate findings on all issues, based on the evidence now in the record and such additional evidence as it may hereafter receive. (4 Cal.Jur.2d, Appeal and Error, § 670, pp. 561-562.)

It is ordered, therefore, that the judgment be reversed and that the cause be remanded with directions to the trial court to set aside the findings of fact and conclusions of law; to receive such additional evidence as it may deem necessary or advisable; thereafter having reexamined and redetermined all issues to make and file findings of fact thereon based upon the evidence, including that now in the record, and in conformity with the views herein expressed; to draw proper conclusions of law therefrom; and to enter judgment accordingly. Such find-

ings of fact, conclusions of law and judgment shall be prepared, signed, filed and entered in the manner provided by law.

The judgment is reversed and the cause is remanded to the trial court to proceed with the disposition thereof under the directions and in conformity with the views herein expressed. Appellant shall recover costs on appeal.

Molinari, J., and Bray, J.,* concurred.

---

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.