**In the Matter of BELMETALS MFG. CO., Inc., a corporation, Bankrupt.**
**No. 101309.**

United States District Court
N. D. California.
May 21, 1969.

———◆———

Henry Cohen, Anixter & Aronson, Burlingame, Cal., for applicant.

John Poppin, of Dinkelspiel & Dinkelspiel, San Francisco, Cal., for trustee.

## ORDER AFFIRMING REFEREE

WOLLENBERG, District Judge.

The petitioners, Mr. and Mrs. John Eranosian and Mr. and Mrs. Henry Pahland, together with two other individuals who were minority shareholders, owned all of the 1,000 shares of the bankrupt corporation, Belmetals. During 1964, one Robert Jernberg entered into negotiations, to purchase these shares. Pursuant to these negotiations, Jernberg himself purchased the 75 shares held by the two minority shareholders, together with 120 of the 500 shares owned by the Eranosians and 102 of the 425 shares owned by the Pahlands, all for the price of $240 per share, or a total of $168,720, to be paid for in cash, notes, and the purported transfer of certain personal property of the corporation to Eranosian and Pahland, to take place on April 1, 1965. By an agreement dated January 2, 1965, but which the Referee found to have been executed "simultaneously" with the December 31, 1964 agreement, Eranosian and Pahland agreed to sell back to the corporation the same personal property, also on April 1, 1965, for $121,131.00, payable $50,381 in cash and $70,750 by note.

The agreement also provided that if an amount then accrued on the books as a potential liability to the profit sharing plan did not have to be so paid, then the interest of Eranosian and Pahland therein would be paid to them as part of the stock purchase price. The Referee found that under this provision there became payable to Eranosian $2,000.31 and to Pahland $1,610.35.

On the notes executed by the corporation in payment for the stock, there remains unpaid to Eranosian $18,909.96 and to Pahland $16,073.42.

On the corporate note of $70,750 purportedly given for the repurchase by the corporation for its equipment, $43,701.82 remains unpaid.

Petitioners contend that the intermediate equipment sale-repurchase transaction here was suggested by the attorney for Jernberg in order to give the corporation a stepped-up basis for its equipment so that it could obtain the benefits of additional depreciation deductions for tax purposes. But the Referee found that at least an equally important purpose of the equipment transaction was to circumvent the limitations of California Corporations Code § 1707(c) upon corporate stock repurchases in amounts exceeding the corporation's earned surplus fund.

Petitioners filed a reclamation petition seeking the recovery from the trustee of all amounts not yet paid on both the direct stock purchase transaction and the intermediate equipment transaction. Based upon his conclusion as to the motive for the equipment transaction, the Referee denied the reclamation petition.

As part of his answer to the reclamation petition, the trustee sought affirmative judgment for the amount already paid by the corporation to Eranosian and Pahland for their stock, pursuant to Cal.Corp.Code, § 1715, which deals with such stock repurchases where the corporation's earned surplus was insufficient to pay for the stock at the time the transaction was agreed upon, and the stockholders had knowledge of facts indicating such impropriety. The Referee found that Eranosian had already received $60,214.93 and Pahland had already received $50,547.12, and he granted the trustee judgment for these sums against petitioners.

Petitioners appeal from the Referee's denial of their reclamation petition and his judgment against them for the sums they have already received. This Court

affirms both aspects of the Referee's decision.

I

PETITIONERS' CLAIMS FOR AMOUNTS UNPAID ON THE STOCK REPURCHASE TRANSACTION—CAL.CORP.CODE, § 1707(c)

### A. PETITIONERS' MOTIVE

Cal.Corp.Code, § 1707(c) provides in part: "A corporation may \* \* \* purchase shares issued by it, or by a corporation of which it is a subsidiary, in any of the following cases: \* \* \* (c) Subject to any limitations contained in its articles, out of earned surplus. \* \* \* ".

Petitioners contend that the transcript affords no evidence for the Referee's finding that petitioners' motive in undertaking the corporate equipment transaction was to circumvent the requirements of § 1707(c). They quote the testimony of the attorney who represented them in the transaction, Mr. Charles Tuckman, who testified that the equipment purchase transaction was carried out only at the behest of the attorney for Jernberg, in order to obtain a stepped-up basis on the equipment, and that Tuckman himself would otherwise have arranged the sale for cash and promissory notes. But the Referee did not find this testimony credible, since such a direct arrangement would on its face have violated § 1707(c), and Mr. Tuckman, whom petitioners themselves describe as "an active member of the California and San Francisco bars, and a certified public accountant" must have known this.

■ Under General Bankruptcy Order 47, the Referee's findings are binding on this court unless "clearly erroneous", and the finding on motive here does not appear to fail this test, especially since the Referee had the advantage of observing the witness in determining the credibility of his testimony.

2 Collier, Bankruptcy, § 39.28, p. 1524 (1968 ed.).

Moreover, it should also be noted that § 1707(c) does not speak in terms of motive, but only in terms of consequence. And the consequence of the total stock transaction here, when we look through the intermediate equipment transaction, is a purchase by the corporation of its own stock in excess of available earned surplus funds.

### B. ADEQUACY OF THE EARNED SURPLUS

Petitioners have made various attempts to show that the corporation's earned surplus as of the date of the basic stock transaction (December 31, 1964) was adequate to cover the purchase price for the stock.

The corporation makes its accounting on a fiscal year basis commencing April 1 of each year. In his Memorandum Opinion dated March 13, 1968, the Referee included as part of earned surplus the item of $19,500 shown on the corporation's balance sheet of December 31, 1964 as "Net Profit for Nine Months Ended December 31, 1964 (After Provision for Federal Income Taxes)". The Referee thereby calculated an earned surplus of $128,273.59. But in his Findings and Conclusions dated September 4, 1968, the Referee ignored this net profit item and so found the earned surplus as of December 31, 1964 to be only $108,773.59.

Since this Court takes the view, to be discussed below, that *any* deficiency in the corporation's earned surplus makes the stock purchase void *in toto*, it is not necessary to decide whether the net profit figure should be included in earned surplus here, since even with such an inclusion the earned surplus was insufficient to cover the sale price of $168,720. This is because, for reasons which will appear shortly, this Court refuses to find the earned surplus augmented by the hypothetical allowance for prior over-depreciation, as petitioners urge, and without such an addition the

earned surplus as of December 31, 1964 does not even approach the sale price figure.

1. Increasing the Earned Surplus Account by Allowance for a Profit Sharing Contribution Plus Allowance for Prior Over-Depreciation of the Equipment Involved in the Stock Sale.

a. *The profit sharing contribution.* On the corporation's balance sheet for December 31, 1964, an item described as a "Provision for Profit Sharing Contribution" was shown as a deduction from net income. The corporation was only obligated on this account if it earned over $25,000 in a fiscal year. It turns out that at the close of its March 31, 1965 fiscal year the corporation did not make in excess of $25,000 earnings, so there was no obligation to the profit sharing account. According to the December 31, 1964 agreement, in the absence of such obligation the amount in the account as of December 31, 1964 would therefore be distributed to Eranosian and Pahland in proportion to their respective former stock interests in the corporation at that date, after first being transferred to the corporation's earned surplus account. Eranosian and Pahland never received such a distribution, so it remained available for transfer to earned surplus.

The trustee contends that since the corporation's fiscal year had not ended on December 31, 1964, there was no way of determining on that date whether the corporation would actually make in excess of $25,000 income and would therefore be required to contribute to the profit-sharing plan. A retroactive addition to earned surplus, continues the trustee, would therefore be improper.

Again, as with the item of net profits for the nine months prior to December 31, 1964, this Court need not dally with the profit sharing item, since petitioners will still fall far short of pulling the earned surplus figure up to the necessary mark of $168,720, because of the finding of this Court on the next matter.

b. *Allowance for past over-depreciation of the corporation's equipment.* Prior to making the equipment sale-repurchase agreements, Eranosian, Pahland, and Jernberg engaged the services of the Tait Appraisal Company to determine the present value of the equipment. The resulting appraisal (hereafter referred to as the Tait Appraisal) fixed the current value of the equipment at $116,381, as contrasted with its book value as of December 31, 1964, of $20,811.23. It is apparent that petitioners and Jernberg relied on the Tait Appraisal figure in arranging the "purchase" and "resale" of the equipment to the corporation for $121,131 (recall that the Referee viewed the $121,131 item as part of the price the corporation paid for its stock on December 31, 1964).

Petitioners argue that the Tait Appraisal indicates that the equipment had been over-depreciated in the past. Depreciation is an offset to profits, and hence over-depreciation erroneously lowers the earned surplus account. Petitioners contend that the amount of current depreciation shown on the balance sheet for December 31, 1964 should be eliminated and the amount thereof added back to the earned surplus account, and that this should be done for prior years also. Petitioners thereby arrive at a figure of $42,896.02 over-depreciation, which they add back into the earned surplus account.

But to accept the Tait Appraisal as a revision of the book value of the equipment, and then to increase earned surplus by a corrective figure for over-depreciation, is in effect to allow the corporation to pass assets to its shareholders Eranosian and Pahland without any more concrete indication of the corporation's earning of such assets other than estimated appreciation in the value of its capital equipment. As indicated below, authorities frown on such a distribution of assets to shareholders when based on a "revaluation surplus". I conclude, therefore, that petitioners' attempt to increase the earned surplus fig-

ure by the over-depreciation allowance should be rejected.

**2. Increasing the Earned Surplus Account by Recognizing a Corporate Profit on the Gain on Sale of the Equipment.**

Another line of argument used by petitioners is that the Referee should have accepted the Tait Appraisal for the current value of the assets ($116,381) and should thereby have recognized that the corporation had experienced an appreciation in the value of its assets equal to the difference between the Tait Appraisal and the book value of $20,811.33. If this appreciation were recognized, petitioners argue, then the Referee would also have had to agree that the corporation had made a "Profit on Gain on Sale" of the equipment to petitioners, which would be the difference between the Tait Appraisal and the book value, or $95,569.67. This "Profit on Gain on Sale" figure should, in turn, find its way into earned surplus and this would establish an amount of earned surplus which is more than adequate to cover the stock purchase price of $168,720.

██ This argument might appear persuasive, but in fact its acceptance would be a violation of accepted and sound principles of accounting and corporate finance, as well as California law. To accept petitioners' argument would be to allow the corporation to speculate as to the value of its equipment, and to distribute corporate assets to the petitioners as shareholders on the basis of this speculated appreciation, when the corporation has not itself actually realized the benefits of such appreciation, since the purchase of its own stock does not create an asset for a corporation. Paton, Accountants' Handbook, 3d ed., pp. 1008–1009. Furthermore, asset appreciation in itself is not regarded as creating a profit and hence increasing earned surplus. *Id.* at 811–818.

These principles are followed in California. See Mindenberg v. Carmel Film

Productions, 132 Cal.App.2d 598, 282 P. 2d 1024 (1955); 1 Ballentine & Sterling, California Corporation Law § 147, pp. 299–300; England v. Christensen, 243 Cal.App.2d 413, 422, 52 Cal.Rptr. 402 (1966); Tiedje v. Aluminum Taper Milling Co., 46 Cal.2d 450, 453, 296 P.2d 554 (1956). In Mindenberg, supra, 132 Cal.App.2d at p. 609, 282 P.2d at p. 1031, the Court quoted Robinson v. Wangemann, 75 F.2d 756, 757 (5 Cir.1935), where it is stated:

A transaction by which a corporation acquires its own stock from a stockholder for a sum of money is not really a sale. The corporation does not acquire anything of value equivalent to the depletion of its assets, if the stock is held in the treasury, as in this case. It is simply a method of distributing a proportion of the assets to the stockholder.

**3. Use of the Book Value of the Corporation's Equipment in Determining the Amount of Earned Surplus Required for Payment of the Stock.**

Petitioners' final approach toward establishing an adequate earned surplus is to urge that under orthodox accounting procedure and under the tax accounting methods approved by the Internal Revenue Code[1] the reduction of earned surplus which results from the sale of the equipment in exchange for the corporation's stock should be equivalent to the book value (here, $20,811.33) of that equipment, not its current appraisal value. If this approach were adopted, the corporation's earned surplus, as found by the Referee ($108,773.59), would be more than adequate to finance the stock purchase here.

██ But the transaction involved here was not merely a one-step transaction involving the exchange of corporate equipment for the corporation's stock. The Referee found, and petitioners do not dispute, that the corporation's "repurchase" of its equipment was an integral part of the stock transaction. In

1. See 1954 Int.Rev.Code §§ 317, 311–312; Regs. Sec. 1.312.

effect, therefore, the assets paid out by the corporation in exchange for its stock cannot be gauged according to the book value of the equipment, but must instead be calculated with the use of the price the corporation paid to "repurchase" the equipment ($121,131), and the charge to earned surplus figured accordingly.

C. DOES § 1707(c) RENDER A CORPORATE STOCK REPURCHASE CONTRACT VOID *IN TOTO* IF THE EARNED SURPLUS IS INADEQUATE: OR DOES IT MERELY LIMIT THE AMOUNTS WHICH MAY BE PAID UNDER THE CONTRACT?

■ Since the corporation is presently bankrupt, it obviously has no current earned surplus now, and hence the unsatisfied portions of both the corporate note for "repurchase" of the equipment, as well as the notes which were directly made for the stock purchase, are presently unenforceable. This position was taken in Goodman v. Global Industries, 80 Cal.App.2d 583, 589, 182 P.2d 300 (1947), in interpreting the predecessor to § 1707(c), which was Cal.Civil Code § 342. The *Goodman* position was followed by a federal district court in applying § 1707(c), In re Mathews Construction Co., 120 F.Supp. 818, 821 (S. D.Cal.1954), and I adopt this position here.

D. DOES § 1707(c) REQUIRE THIS COURT TO HOLD VOID THE CORPORATION'S *NOTES* EXECUTED IN PAYMENT FOR THE STOCK, WHEN THE SHAREHOLDER/VENDOR HAS *ALREADY PERFORMED* HIS SIDE OF THE *CONTRACT*?

■ *Mathews Construction* squarely demands an affirmative answer here. Petitioners concede that *Mathews Construction* cannot be distinguished from their case on this point, but they argue that that decision erroneously applied the *Goodman* case, *supra*, since in *Goodman* the court was dealing with a stock repurchase contract which was still executory as to both the corporation and the shareholder/vendor. Petitioners contend that cases such as the present one, where the shareholder/vendors have already performed their side of the contract, and await payment on the corporate note, should be treated differently— that is, the note should be fully enforced —because otherwise shareholders will insist on cash in exchange for their resale of shares to the corporation, and this will hinder such transactions.

Petitioners' argument has some merit but comes at a time when opposing precedent is too strong. Both *Mathews Construction* and *Goodman* were recently cited with approval in Strobel v. Estate of W. H. Butler, 402 F.2d 362 (9th Cir., October 21, 1968). And in 47 A.L.R.2d § 9, "Corporation—Acquisition of Own Stock—Transactions Incomplete When Insolvency Occurs," pp. 774–775, it is stated:

> The transaction must be completed while the corporation remains solvent. The rule is general that even if the corporation was solvent when the transaction was entered into, if the transaction is still executory when the company becomes insolvent it cannot be enforced as against the rights of creditors then existing. This rule applies in two situations, (1) where the stockholder seeks to enforce a contract by the corporation to purchase his stock, and (2) where the corporation has purchased and received the stock and the stockholder later seeks to enforce an obligation given him by the company for the price.

In conclusion, § 1707(c) requires a finding that the corporation's obligation on the notes is now unenforceable.

II

THE TRUSTEE'S COUNTERCLAIM FOR AMOUNTS ALREADY PAID TO PETITIONERS UNDER THE STOCK PURCHASE TRANSACTION—CAL.CORP.CODE, § 1715.

A. JURISDICTION.

■ The trustee's counterclaim falls within the scope of Rule 13 of the Fed-

eral Rules of Civil Procedure as a compulsory counterclaim since it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim", and these rules are expressly made applicable to bankruptcy proceedings by General Bankruptcy Order 37.

## B. THE TRUSTEE'S STANDING.

Bankruptcy Act § 70a(5) provides:

a. The trustee of the estate of a bankrupt * * * shall * * * be vested by operation of law with the title of the bankrupt as of the date of the filing of the petition initiating a proceeding under this title, * * * to all of the following kinds of property * * * (5) property, including *rights of action,* which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him, or otherwise seized, impounded, or sequestered. * * * [Emphasis added.]

Cal.Corp.Code, § 1715 provides:

When a corporation, in violation of any provision of this division, purchases directly or indirectly shares issued by it, * * * any shareholder or owner of shares who sells such shares with knowledge that the corporation is the purchaser and with knowledge of facts indicating the impropriety of the purchase is liable *to the corporation* or its receiver, liquidator, or trustee in bankruptcy to the extent of the payments received therefore * * *. [Emphasis added.]

The trustee contends that since § 1715 gives the corporation a right of action in improper stock transactions, under Bankruptcy Act § 70a(5) the trustee becomes vested with this right of action. This argument is supported in 4A Colliers on Bankruptcy para. 70.29, pp. 432–435.

Petitioners do not dispute the effect of Bankruptcy Act § 70a(5), but they go back one step and contend that in a case such as this where there are no shareholders innocent of the transaction, § 1715 does not apply. Petitioners cite Scales v. Holje, 41 Cal.App. 733, 183 P. 308 (1919), and Fenolio v. McDonald, 171 Cal.App.2d 508, 304 P.2d 657 (1959). *Scales* was decided before the 1947 enactment of § 1715 or any California legislation similar to § 1715, and so it may be laid aside in the present consideration. *Fenolio* involved the transfer of ownership of a one-man corporation from plaintiff to defendant. The corporation executed a note for the repurchase of its stock from plaintiff, and the note was guaranteed by defendant. The defendant sought to defend against the corporation's obligation under the note by pointing out that Cal. Corp.Code, § 1705 prohibited a corporation from repurchasing its shares except under certain conditions (such as presence of adequate earned surplus) which were not present there. The court took note of the *Scales* opinion and held that in the case of a one-man corporation " * * * the sole owner may do what he will with the assets and credit of the corporation and no one but creditors may complain." 171 Cal.App.2d at 512, quoting *Scales, supra,* 41 Cal.App. at 737, 183 P. 308.

■ *Fenolio* should not be distinguished from the present case on the grounds that Belmetals had more than one shareholder, since all the Belmetals shareholders who were such at the time of the transaction involved here were culpable. But there is a viable distinction in the fact that *Fenolio* dealt with § 1707, which does not give the corporation a right of action against shareholder/vendors, while § 1715 does give the corporation such a right. The trustee therefore has standing to make his § 1715 counterclaim in this case.

## C. DID PETITIONERS HAVE KNOWLEDGE OF THE REQUISITE FACTS INDICATING THE IMPROPRIETY OF THEIR TRANSACTION?

England v. Christensen, 243 Cal.App. 2d 413, 52 Cal.Rptr. 402 (1966), makes it clear that § 1715 fastens liability on a

shareholder/vendor so long as he had knowledge of the *facts* of the transaction. If he has such knowledge, he is chargeable with knowledge that the law prohibited the transaction.

There is no dispute about the fact that Mr. Eranosian and Mr. Pahland attended the December 31, 1964 meeting when the stock purchase transactions were negotiated.

But petitioners attempt to show that the wives were not present at that meeting, and hence that the wives lacked culpable knowledge of the § 1715 violation and should not be liable under § 1715 for their respective community property shares of the payments made for the stock. The court in England v. Christensen, 243 Cal.App.2d 413, 432, 52 Cal.Rptr. 402 (1966) indicated that this was the proper course to follow, although the trustee makes the tenable suggestion that since the husband is given the management and control of the community personal property,[2] the husbands' culpable knowledge as to the § 1715 violation should be binding on their wives.

The community property issue need not be resolved here, however, since this court finds that both wives must be charged with the requisite knowledge.

Petitioners' assertion that Mrs. Eranosian was not present at the meeting is flatly contradicted by the testimony before the Referee, and hence should be rejected even though the minutes of the meeting do not report her presence.

While Mrs. Pahland's signature is on the documents signed by the other petitioners at the December 31 meeting, petitioners insist that this is insufficient evidence of her presence at the meeting —she could have signed them at an earlier or later date, or she could have dropped in at the meeting only long enough to sign her name. However, the Referee did not find that Mrs. Pahland lacked the requisite knowledge. His finding does not appear clearly erro-

neous, and hence must be affirmed under General Bankruptcy Order 47.

For the above reasons, the Referee is affirmed in his denial of petitioners' reclamation petition and his grant of the trustee's counterclaim for payments already made to petitioners under the stock repurchase transaction.